

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____ ☐ Agent ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

1. Article Addressed to:

Michael J. Harrington
Senior Vice President and General Counsel
Eli Lilly and Company
Lilly USA, LLC
Lilly Corporate Center
893 S Delaware St
Indianapolis, IN 46285

3. Service Type
   ☑ Certified Mail   ☐ Express Mail
   ☐ Registered       ☐ Return Receipt for Merchandise
   ☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   (Transfer from service label)
   7009 2250 0004 2354 5666

PS Form 3811, February 2004      Domestic Return Receipt      102595-02-M-1540

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____ ☐ Agent ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
LARRY WARDLEY

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

1. Article Addressed to:

John C. Lechleiter, Ph.D.
Chairman, President, and Chief Executive Officer
Eli Lilly and Company
Lilly USA, LLC
Lilly Corporate Center
893 S Delaware St
Indianapolis, IN 46285

3. Service Type
   ☑ Certified Mail   ☐ Express Mail
   ☐ Registered       ☐ Return Receipt for Merchandise
   ☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   (Transfer from service label)
   7009 2250 0004 2354 5673

PS Form 3811, February 2004      Domestic Return Receipt

Exhibit E




Revised

**CERTIFIED MAIL - RETURN RECEIPT REQUESTED**

**TO:**    **John C. Lechleiter, Ph.D.,**
**Chairman, President, and Chief Executive Officer**
**Eli Lilly and Company**
**Lilly USA, LLC**
**Lilly Corporate Center**
**893 S Delaware St**
**Indianapolis, IN 46285**

**Michael J. Harrington**
**Senior Vice President and General Counsel**
**Eli Lilly and Company**
**Lilly USA, LLC**
**Lilly Corporate Center**
**893 S Delaware St**
**Indianapolis, IN 46285**

**FROM:**    **Dr. Reddy's Laboratories, Ltd.**
**Dr. Reddy's Laboratories, Inc.**

**DATE:**    **December 22, 2015**

**RE:**    **NOTICE OF PARAGRAPH IV CERTIFICATION RE: DR. REDDY'S LABORATORIES, LTD.'S AND DR. REDDY'S LABORATORIES, INC.'S PEMETREXED FOR INJECTION 100MG/VIAL, 500MG/ VIAL; U.S. PATENT NO. 7,772,209**

Dear Sirs:

Pursuant to § 505(b)(3)(B) of the Federal Food, Drug and Cosmetic Act ("the Act") and § 314.52 of Title 21 of the Code of Federal Regulations ("C.F.R."), please be advised that Dr. Reddy's Laboratories, Ltd. ("DRL") has filed a patent certification pursuant to § 505(b)(2)(A)(iv) of the Act and § 314.50(i)(1)(i)(A)(4) of Title 21 of the C.F.R. in support of New Drug Application ("NDA") Number 208297 with respect to pemetrexed for injection, comprising the active ingredient in an amount equivalent to 100 mg or 500 mg pemetrexed per vial ("DRL's proposed product"), and DRL seeks to obtain approval to engage in the commercial manufacture, use, sale, or importation of DRL's proposed product before the expiration of the patent referred to in the certification.

We understand that U.S. Patent No. 7,772,209, the patent referred to in the certification,

is assigned to Eli Lilly and Company ("Lilly"). We also understand that Lilly is the holder of the application under § 505(b) of the Act (New Drug Application) in connection with pemetrexed for injection (ALIMTA®), for intravenous use.

DRL provides the following information:

(1) The U.S. Food and Drug Administration ("FDA") has received an NDA pursuant to section 505(b)(2) of the Act submitted by DRL with respect to pemetrexed for injection (comprising the active ingredient in an amount equivalent to 100 mg or 500 mg pemetrexed per vial);

(2) The NDA number is 208297;

(3) The established name of DRL's proposed product, as defined in § 502(e)(3) of the Act, is "pemetrexed for injection";

(4) The active ingredient of DRL's proposed product is L-Glutamic acid, N-[4-[2-(2-amino-4,7-dihydro-4-oxo-1H-pyrrolo[2,3-d]pyrimidin-5-yl)ethyl]benzoyl]-, ditromethamine salt; DRL's proposed product is a single-use vial containing the active ingredient in amount equivalent to 100 mg or 500 mg of pemetrexed as lyophilized powder to be administered as an intravenous infusion.

(5) The U.S. patent number and expiration date, as known to DRL, of the patent alleged to be invalid, unenforceable and/or not infringed is: U.S. Patent No. 7,772,209 ("the '209 patent") entitled "Antifolate Combination Therapies," issued on August 10, 2010, which is listed in the Electronic "*Approved Drug Products with Therapeutic Equivalence Evaluations*" ("Orange Book") under ALIMTA® as expiring on Nov. 24, 2021. The pediatric exclusivity associated with this product expires on May 24, 2022.

(6) The information detailed in this letter and the attached memorandum is supplied for the sole purpose of complying with the above-referenced statutes and regulations, and neither DRL nor its attorneys waive any attorney-client privilege or attorney work product immunity concerning the subject matter of this communication; and

(7) DRL reserves its right to supplement this letter and the attached memorandum detailing the factual and legal basis for DRL's assertion of invalidity, unenforceability and/or non-infringement of the '209 patent should subsequent investigations reveal additional grounds for asserting invalidity, unenforceability and/or non-infringement.

DRL is seeking approval from the FDA to market and sell DRL's proposed product prior to the expiration of the '209 patent. DRL certified with the FDA pursuant to § 505(b)(2)(A)(iv) of the Act and 21 C.F.R. § 314.50(i)(1)(i)(A)(4) ("Paragraph IV Certification") that the '209 patent is invalid, unenforceable and/or will not be infringed by the manufacture, use, sale, offer to sell in the United States or importation into the United States of DRL's proposed product for which DRL has submitted its application.

**Offer of Confidential Access:** In addition to and not in lieu of the limitations contained in 21 U.S.C. § 355(c)(3)(D)(i)(III) (as amended December 8, 2003) DRL hereby offers conditional access to only those portions of DRL's NDA that, in DRL's judgment, are needed by Lilly to determine whether an action under Section 355 should be filed within 45 days of the receipt of this letter. Access to the information is and shall be limited to only those attorneys acting as outside counsel for Lilly that are needed to evaluate the information for that purpose and such persons who are to have access shall be identified to DRL's representative, Jeffery B. Arnold, Esq. at Cantor Colburn, LLP, 1180 Peachtree Street, N.E., Suite 2050, Atlanta, GA 30309 (phone: 404.607.9991) before access is granted. Such persons so identified shall agree in writing that the information can only be used for the stated purpose of determining whether to file suit within the 45-day period. Those persons receiving access to DRL's NDA materials shall not be involved directly or indirectly in any work before any patent office, including the United States Patent Office (prosecution or post issue), involving pemetrexed, or in any counseling, litigation or other work before or involving a regulatory agency, including the U.S. FDA, relating to pemetrexed. Any tangible form of information derived from a review of the material, and the material itself, shall be destroyed, with notice to DRL's representative, Jeffery B. Arnold, Esq., within 45 days of inspection or upon the filing of an action against DRL, whichever is earlier.

Pursuant to 21 C.F.R. § 314.95(c)(7), DRL authorizes the following agent to accept service of process:

Lee Banks, Esq.
Vice President, Intellectual Property
Dr. Reddy's Laboratories, Inc.
107 College Road East
Princeton, NJ 08540

Attached hereto is a memorandum setting forth DRL's detailed factual and legal basis supporting its Paragraph IV Certification.

Dr. Reddy's Laboratories, Ltd.

By:

Lee Banks, Esq.
Vice President, Intellectual Property
Dr. Reddy's Laboratories, Inc.
107 College Road East
Princeton, NJ 08540

Attachment

TO:   **John C. Lechleiter, Ph.D.,**
     **Chairman, President, and Chief Executive Officer**
     **Lilly USA**
     **Lilly Corporate Center**
     **893 S Delaware St**
     **Indianapolis, IN 46285**

     **Michael J. Harrington**
     **Senior Vice President and General Counsel**
     **Lilly USA**
     **Lilly Corporate Center**
     **893 S Delaware St**
     **Indianapolis, IN 46285**

FROM:  **Dr. Reddy's Laboratories, Ltd.**
     **Dr. Reddy's Laboratories, Inc.**

DATE:  **December 22, 2015**

RE:   **DETAILED FACTUAL AND LEGAL BASIS FOR DR. REDDY'S LABORATORIES, LTD.'S AND DR. REDDY'S LABORATORIES, INC.'S ASSERTION OF INVALIDITY, UNENFORCEABILITY AND/OR NON-INFRINGEMENT OF U.S. PATENT NO. 7,772,209 RE: PEMETREXED FOR INJECTION (100 MG/ VIAL, 500 MG/VIAL)**

## I.  INTRODUCTION

   Dr. Reddy's Laboratories, Inc. on behalf of Dr. Reddy's Laboratories, Ltd. ("DRL"), has

submitted a New Drug Application pursuant to section 505(b)(2) of the Food, Drug, and

Cosmetic Act ("FDCA") to the Food and Drug Administration ("FDA") to obtain authorization

to manufacture, import, use, market and sell a competitive product to ALIMTA® (pemetrexed for

injection, comprising the active ingredient in an amount equivalent to 100 mg or 500 mg pemetrexed per vial) ("DRL's proposed product"). Eli Lilly and Company ("Lilly") currently markets ALIMTA®, a product for injection that contains pemetrexed disodium in an amount equivalent to 100 mg or 500 mg pemetrexed per vial.

As of the date of this Detailed Statement of Factual and Legal Basis, U.S. Patent No. 7,772,209 ("the '209 patent") is listed under ALIMTA® in the electronic version of the FDA publication *Approved Drug Products with Therapeutic Equivalence Evaluations* ("Orange Book"). The Orange Book indicates that the '209 patent is set to expire on Nov. 24, 2021, and that the pediatric exclusivity associated with this product is set to expire on May 24, 2022.

DRL has certified with the FDA that the '209 patent is invalid, unenforceable and/or will not be infringed by the manufacture, use, sale, offer to sell, or importation into the United States of DRL's proposed product for which DRL has submitted its 505(b)(2) New Drug Application. Pursuant to 21 U.S.C. § 355(b)(2)(A)(iv) and 21 C.F.R. § 312.52(c)(6), this memorandum provides the detailed factual and legal basis supporting DRL's certification.

## II.    DRL'S PROPOSED PRODUCT

DRL's proposed product, upon approval, would be marketed as a competing product to ALIMTA®. However, unlike ALIMTA®, in which the active pharmaceutical ingredient ("API") is pemetrexed disodium heptahydrate, DRL's proposed product is void of any sodium salt of pemetrexed. Rather, the active pharmaceutical ingredient in DRL's proposed product is pemetrexed ditromethamine. Further, in contrast to ALIMTA®, which is to be reconstituted in 0.9% sodium chloride injection and then further diluted into a solution of 0.9% sodium chloride

(saline) injection, the label of DRL's proposed product does not allow for its reconstitution or subsequent dilution in saline. Rather, the label of DRL's proposed product only permits its reconstitution in 5% dextrose injection, and subsequent dilution into a solution of 5% dextrose injection.

## III.   THE '209 PATENT

### A.   Overview

The '209 patent, entitled "Antifolate Combination Therapies," issued on August 10, 2010 with 22 claims from United States Patent Application No. 11/776,329 ("the '329 application"). The '209 patent claims priority to U.S. Provisional Application Nos. 60/215,310 ("the '310 provisional application"), 60/235,859 ("the '859 provisional application"), and 60/284,448 ("the '448 provisional application"), which were filed on June 30, 2000, September 27, 2000, and April 18, 2001, respectively. Further, the '209 patent claims priority to U.S. Patent Application No. 11/288,807 filed on November 29, 2005 ("the '807 application") and U.S. Patent Application No. 10/297,821 filed as PCT Application No. PCT/US01/14860 on June 15, 2001 ("the '821 application"). The '209 patent is assigned to Eli Lilly and Company.

According to the Orange Book, the '209 patent is associated with Patent Use Codes U-1077 and U-1296. Patent Use Code U-1077 is defined in the Orange Book as "pretreatment of patients with Vitamin B12 and folic acid prior to pemetrexed disodium administration." Patent Use Code U-1296 is defined in the Orange Book as "use of pemetrexed with prior and/or repeated Vitamin B12 and folic acid administration."

## B.     The '209 Patent Claims

The '209 patent issued with twenty two (22) claims, of which claims 1 and 12 are

independent. The claims of the '209 patent are generally directed to methods for administering

pemetrexed disodium to a patient comprising administering an effective amount of folic acid and

an effective amount of methylmalonic acid lowering agent (such as vitamin $B_{12}$) followed by

administering pemetrexed disodium.     Independent claims 1 and 12 are reproduced below

(emphases added):

1.     A method for administering *pemetrexed disodium* to a patient in need
thereof comprising administering an effective amount of folic acid and an
effective amount of a methylmalonic acid lowering agent followed by
administering an effective amount of *pemetrexed disodium*, wherein the
methylmalonic acid lowering agent is selected from the group consisting of
vitamin        B12,        hydroxycobalamin,        cyano-10-chlorocobalamin,
aquocobalamin        perchlorate,        aquo-10-cobalamin        perchlorate,
azidocobalamin, cobalamin, cyanocobalamin, or chlorocobalamin.

12.     An improved method for administering *pemetrexed disodium* to a patient in
need of chemotherapeutic treatment, wherein the improvement comprises: a)
administration of between about 350 µg and about 1000 µg of folic acid
prior to the first administration of *pemetrexed disodium*; b) administration
of about 500 µg to about 1500 µg of vitamin B12, prior to the first
administration of pemetrexed disodium; and c) administration of
*pemetrexed disodium*.

Thus, the independent claims of the '209 patent require administering pemetrexed

*disodium* as an active agent.

## IV.     INFRINGEMENT ANALYSIS

### A.     The Law of Infringement

35 U.S.C. § 271(a) states as follows:

(a) Except as otherwise provided in this title, whoever without authority makes,
uses, offers to sell, or sells any patented invention, within the United States or

imports into the United States any patented invention during the term of the patent
therefor, infringes the patent.

Under the Hatch-Waxman framework, the filing of an ANDA constitutes an artificial act
of infringement for purposes of creating case or controversy jurisdiction. *Glaxo, Inc. v.
Novopharm, Ltd.*, 110 F.3d 1562, 1569 (Fed. Cir. 1997). However, as in all cases in which
patent infringement is asserted, the patentee bears the burden of proving infringement by a
preponderance of the evidence. *See id.* at 1567 ("The plain language of the [Hatch-Waxman]
statute does not alter a patentee's burden of proving infringement. . . .").

It is well settled that determining whether an accused product infringes the claims of a
patent involves the following two steps: (1) ascertaining the meaning and scope of the claims;
and (2) comparing the allegedly infringing device to the properly-construed claims. *E.g., CAE
Screenplates Inc. v. Heinrich Fiedler GmbH & Co.*, 224 F.3d 1308, 1316 (Fed. Cir. 2000).
Since in an ANDA case the allegedly infringing product is not yet on the market, "the ultimate
infringement inquiry . . . is focused on a comparison of the asserted patent claims against the
product that is likely to be sold following ANDA approval and determined by traditional patent
law principles." *Ferring B.V. v. Watson Labs., Inc. Florida*, 764 F.3d 1401, 1408 (Fed. Cir.
2014).

### 1.    **Claim Construction**

The first step in an infringement analysis is to ascertain the meaning and scope of the
claims. *See, e.g., Process Control Corp. v. Hydreclaim Corp.*, 190 F.3d 1350 (Fed. Cir. 1999).
The "ultimate interpretation" of a patent claim "is a legal conclusion." *Teva Pharms. USA, Inc.
v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015); *see also Markman v. Westview Instruments, Inc.*, 52

F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996). Construction of a claim term involves evaluating "the term's plain and ordinary meaning as understood by a person of ordinary skill in the art." *Allergan, Inc. v. Apotex, Inc.*, 754 F.3d 952, 957 (Fed. Cir. 2014), *citing Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*). The ordinary and customary meaning of a claim term is the meaning that a person of ordinary skill in the art in question, at the time of invention, would have understood the claim to mean. *Phillips*, 415 F.3d at 1313. The sources available to understand disputed claim language include the words of the claims themselves, the remainder of the specification, the prosecution history and extrinsic evidence, including relevant scientific principles, the meaning of technical terms, and the state of the art. *Id.* at 1314.

"[C]laim construction involves consideration of primarily the intrinsic evidence, viz., the claim language, the specification, and the prosecution history." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (citation omitted). Indeed, "the best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history." *Phillips*, 415 F.3d at 1315, *quoting MultiForm Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998). Along with the specification and the prosecution history, in some cases, a court will be required "to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva v. Sandoz*, 135 S. Ct. at 841. "Though the ultimate construction of a claim term is a legal question reviewed de novo, underlying factual determinations made by the district court based on extrinsic evidence are reviewed [by the

appellate court] for clear error." *Biosig*, 783 F.3d at 1378, *citing Teva v. Sandoz*, 135 S. Ct. at 842.

## 2. Literal Infringement

Literal infringement is found where the accused device falls within the scope of the asserted claims as properly interpreted. *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995). For literal infringement, each limitation in the asserted claim must be found present in the accused device. *General Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F.3d 978, 981 (Fed. Cir. 1997); *see Southwall*, 54 F.3d at 1575 ("To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly.").

## 3. Infringement Under the Doctrine of Equivalents

Infringement may also be found under the judicially-created doctrine of equivalents. The doctrine of equivalents requires asking whether the accused product contains elements identical or equivalent to each claimed element of the patented invention. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29, 40 (1997). One test for whether an element is equivalent is whether the substitute element performs substantially the same function, way and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element. *Id.*; *see also Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950).

There are several limitations on the doctrine of equivalents. For example, the range of equivalents may not be expanded to cover the prior art. *Wilson Sporting Goods v. David Geoffrey & Assoc.*, 904 F.2d 677, 684-85 (Fed. Cir. 1990) ("the doctrine of equivalents cannot be extended to ensnare what is in the prior art."). In addition, claims may not be expanded by the

doctrine of equivalents to capture unclaimed, but disclosed, subject matter. "[A] patentee cannot narrowly claim an invention to avoid prosecution scrutiny by the PTO, and then, after patent issuance, use the doctrine of equivalents to establish infringement because the specification discloses equivalents." *Johnson & Johnston Assocs. v. R.E. Serv. Co.*, 285 F.3d 1046, 1054 (Fed. Cir. 2002) (*en banc*).

The application of the doctrine of equivalents may also be limited by prosecution history estoppel, which "precludes a patentee from obtaining under the doctrine of equivalents coverage of subject matter that has been relinquished during the prosecution of its patent application." *Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*, 170 F.3d 1373, 1376 (Fed. Cir. 1999); *see Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 734 (2002) ("Prosecution history estoppel ensures that the doctrine of equivalents remains tied to its underlying purpose."). "A number of activities during prosecution may give rise to prosecution history estoppel, including arguments made to obtain allowance of the claims at issue." *Pharmacia*, 170 F.3d at 1376-77 (citations omitted).

## 4. Inducement of Infringement

35 U.S.C. § 271(b) provides that "whoever actively induces infringement of a patent shall be liable as an infringer." According to the United States Supreme Court, "induced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, __, 131 S. Ct. 2060, 2068 (2011). "Inducement requires a showing that the alleged inducer knew of the patent, knowingly induced the infringing acts, and possessed a specific intent to encourage another's infringement of the patent." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1328 (Fed. Cir. 2009), *citing*

*DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (*en banc* in pertinent part). "The inducement rule . . . premises liability on purposeful, culpable expression and conduct. . . ." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 937 (2005).

The Supreme Court "has clarified that the intent requirement for inducement requires more than just intent to cause the acts that produce direct infringement. Beyond that threshold knowledge, the inducer must have an affirmative intent to cause direct infringement." *DSU*, 471 F.3d at 1306, *citing Grokster*. "The 'mere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven.'" *Id.* at 1305, *quoting Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1364 (Fed. Cir. 2003); *see also Grokster*, 545 U.S. at 937 ("mere knowledge of infringing potential or of actual infringing uses would not be enough here to subject a distributor to liability"). Moreover, "[s]uch intent cannot be inferred merely based upon selling a product where that product has substantial non-infringing uses." *Acorda Therapeutics Inc. v. Apotex Inc.*, No. 07-4937, 2011 WL 4074116, at *14 (D.N.J. Sept. 6, 2011) (citations omitted), *aff'd without opinion*, 476 F. App'x 746 (Fed. Cir. 2012).

The Federal Circuit recently reiterated that the "sale of a lawful product by lawful means, with the knowledge that an unaffiliated, third party may infringe, cannot, in and of itself, constitute inducement of infringement." *Takeda Pharms. U.S.A. Inc. v. West-Ward Pharm. Corp.*, 785 F.3d 625, 630 (Fed. Cir. 2015), *quoting Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1276 n.6 (Fed. Cir. 2004).[1]

---

[1] Although the citation is omitted from the *Takeda* opinion, the authority for the language quoted in footnote 6 of the *Dynacore* opinion is *Organon Inc. v. Teva Pharms., Inc.*, 244 F. Supp. 2d

The Supreme Court has recognized that providing instructions for using a product could constitute "active steps" that would support a finding of intent to induce infringement. *Grokster*, 545 U.S. at 936. The issue is whether the "instructions teach an infringing use of the device such that we are willing to infer from those instructions an affirmative intent to infringe the patent." *Vita-Mix*, 581 F.3d at 1329 n.2. In *Vita-Mix*, the Federal Circuit recognized that product instructions (there, directions for operating a blender) did not evidence a specific intent to encourage infringement because they taught a stirring action that the defendant "could have reasonably believed was non-infringing." *Id.* at 1329. After being apprised of the patentee's infringement contentions (before suit was filed), the accused infringer amended its instructions to "teach an undisputedly non-infringing use," which the court said "evidenc[ed] an intent to *discourage* infringement. *Id.* (emphasis added); *see also Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1322 (Fed. Cir. 2009) (reversing jury verdict of inducement where "any customer who actually followed [the accused infringer's] instructions would not have performed the steps recited in the asserted claims").

In the Hatch-Waxman context, "[t]he [ANDA product] label must encourage, recommend, or promote infringement." *Takeda*, 785 F.3d at 631; *see also United Therapeutics Corp. v. Sandoz, Inc.*, 2014 U.S. Dist. LEXIS 121573, at \*48 (D.N.J. Aug. 29, 2014) ("The law of inducement requires a showing by [the patentee] that [the generic's] ANDA label actually *instructs* physicians to dilute its product with Sterile Diluent for Flolan or some other high pH glycine buffer." (emphasis in the original)). "[V]ague label language cannot be combined with speculation about how physicians may act to find inducement" because this "would seem to too

---

370, 380 (D.N.J. 2002).

easily transform that which we have held is 'legally irrelevant,' in *Warner-Lambert*, 316 F.3d at

136--mere knowledge of infringing use--into induced infringement." *Takeda*, 785 F.3d at 632.

Indeed, as the Federal Circuit recognized in *Takeda*:

> This requirement of inducing acts is particularly important in the Hatch-Waxman
> Act context because the statute was designed to enable the sale of drugs for non-
> patented uses even though this would result in some off-label infringing uses. *See*
> *Caraco*, 132 S. Ct. at 1681-82 ("Congress understood [that] a single drug may
> have multiple methods of use, only one or some of which a patent covers' and that
> the statute 'contemplates that one patented use will not foreclose marketing a
> generic drug for other unpatented ones."); *Warner-Lambert*, 316 F.3d at 1359
> ("the Hatch-Waxman Act was not intended "as a sword against any competitor's
> ANDA seeking approval to market an off-patent drug for an approved use not
> covered by the patent.").

*Id.* at 631-32.

### 5.     Contributory Infringement

Contributory infringement is defined by 35 U.S.C § 271(c), which states as follows:

> Whoever offers to sell or sells within the United States or imports into the United
> States a component of a patented machine, manufacture, combination or
> composition, or a material or apparatus for use in practicing a patented process,
> constituting a material part of the invention, knowing the same to be especially
> made or especially adapted for use in an infringement of such patent, and not a
> staple article or commodity of commerce suitable for substantial noninfringing
> use, shall be liable as a contributory infringer.

The existence of substantial non-infringing uses defeats a claim for contributory

infringement as a matter of law. *Vita-Mix*, 581 F.3d at 1328; *see also Toshiba Corp. v. Imation

Corp.*, 681 F.3d 1358, 1362 (Fed. Cir. 2012). "[N]on-infringing uses are substantial when they

are not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." *Vita-

Mix*, 581 F.3d at 1327. Thus, "a sale of an article which though adapted to an infringing use is

also adapted to other and lawful uses, is not enough to make the seller a contributory infringer."

*Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 441 (1984), *quoting Henry v. A.B. Dick Co.*, 224 U.S. 1, 48 (1912).

## B.    Application of the Law:  There Is No Infringement of Any Claim of the '209 Patent Pursuant to DRL's Proposed Formulation and Label

### 1.    Claim Construction

The only term that merits discussion is "*pemetrexed disodium*" that appears in independent claims 1 and 12 of the '209 patent.  Specifically, all claims of the '209 patent require the administration of a therapeutically effective amount of pemetrexed disodium.  Since pemetrexed disodium is not present in DRL's proposed product, no infringement of the claims of the '209 patent can occur.

The '209 patent specification consistently points to the necessity of an effective amount of pemetrexed disodium (an antifolate).  In the Abstract section of the specification, the invention of the '209 patent is summarized as "a method of administering an antifolate to a mammal in need thereof, comprising administering an effective amount of said antifolate in combination with a methylmalonic acid lowering agent."  The '209 patent, Abstract.  Mirroring this position, the '209 patent specification repeatedly emphasizes the requirement of an effective amount of the antifolate.  *Id.*, col. 2, line 55 – col 3, line 18; *see e.g.* col. 2, lines 55-58:

> The *present invention* relates to a method of administering an antifolate to a mammal in need thereof, comprising administering an effective amount of said antifolate in combination with a methylmalonic acid lowering agent (emphasis added).

In order to further demonstrate the invention, the inventors refer to an effective amount of the active agent when describing how the antifolate drug and the methylmalonic acid should be administered to the patient.  *Id.*, col. 4, lines 9-14.  Further, the specification is replete with

references to administration of ALIMTA®, Lilly's FDA approved pemetrexed disodium drug in clinical trial studies involving cancer patients. *See, id.* at col. 8, l. 39 – col. 10, l. 53. Lilly's pemetrexed disodium drug ALIMTA®, by virtue of being FDA approved, necessarily contains pemetrexed disodium in an amount that is capable of providing a therapeutic benefit to the patient in need thereof.

Finally, the prosecution history of the '209 patent provides further support that it is essential to the invention that the administration of pemetrexed disodium according to claim 12 of the '209 patent be in an effective amount, *i.e.*, in an amount that is capable of providing a therapeutic benefit to the patient in need thereof. Specifically, in an amendment filed on November 13, 2009, the applicants added claim 53 (that eventually issued as independent claim 12) as a new claim. Reply and amendment dated Nov. 13, 2009, p. 3. In the accompanying remarks, in response to the Examiner's 103 rejections, Lilly stated: "The *presently claimed invention* is directed to improving the therapeutic utility of *pemetrexed disodium* by administering to a patient a methylmalonic acid lowering agent and folic acid followed by administering an effective amount of *pemetrexed disodium*." *Id.* at 5 (emphasis added). *See also id.* at 12 (Conclusion) ("A skilled artisan would not have expected the reduction of severe toxicities associated with *pemetrexed disodium*, such as patient death, without the expected effect of reduction of *pemetrexed disodium*'s efficacy.") (emphasis added).

Thus, based on the language of claims 1 and 12, and consistent statements in the specification as well as the prosecution history of the '209 patent, it is clear that all claims of the '209 patent are directed and limited to the administration of pemetrexed disodium. Accordingly,

the term "pemetrexed disodium" in all claims of the '209 patent must be construed to mean "the *disodium salt of pemetrexed* administered in a therapeutically effective amount."

## 2. No Direct Infringement Either Literally or Under the Doctrine of Equivalents

Claims 1-22 of the '209 patent will not be infringed, either literally or under the doctrine of equivalents, by DRL's proposed product.

### a. DRL's Proposed Product Will Not Literally Infringe Independent Claims 1 and 12 of the '209 Patent

DRL's proposed product cannot literally infringe a claim of the '209 patent unless each element of the asserted claim is found present in DRL's proposed product. *See General Mills*, 103 F.3d at 981. Independent claims 1 and 12 of the '209 patent require, *inter alia*, the administration of *pemetrexed disodium* in an amount that is capable of providing a therapeutic benefit to the patient in need thereof. Thus, Lilly, as the patentee, bears the burden of proving by preponderance of the evidence that DRL's proposed product contains pemetrexed disodium in an amount that is capable of providing a therapeutic benefit to the patient in need thereof. *See Ferring*, 764 F.3d at 1388 (*citing Glaxo*, 110 F.3d at 1570). For the reasons discussed below, Lilly will be unable to do so.

First, the API in DRL's proposed product is *pemetrexed ditromethamine*, a pemetrexed salt different from the claimed pemetrexed disodium. The figure below specifically compares the structure of pemetrexed disodium (as required by independent claims 1 and 12 of the '209 patent, and as present in Lilly's ALIMTA® product) and pemetrexed ditromethamine (present in DRL's proposed product).

Pemetrexed disodium



Pemetrexed ditromethamine

Additionally, according to DRL's proposed label, the method of using DRL's proposed product involves the use of pemetrexed ditromethamine, *not* pemetrexed disodium. Because DRL's proposed product does not contain pemetrexed disodium as the API, the administration of DRL's proposed product cannot literally infringe independent claims 1 and 12 of the '209 patent.

Second, DRL's proposed label directs that the vials containing pemetrexed ditromethamine are to be reconstituted in 5% Dextrose Injection (preservative free). 5% dextrose solution is a sodium-free solution comprised of dextrose and water that is commonly used as an injection vehicle for injectable drugs. Thus, Lilly would be unable to prove by a preponderance of the evidence that the pemetrexed ditromethamine present in DRL's proposed product, somehow, will be converted to pemetrexed disodium when it is reconstituted in dextrose solution.

Accordingly, for the reasons discussed above, independent claims 1 and 12 of the '209 patent will not be literally infringed by the administration of DRL's proposed product.

      **b.**      **DRL's Proposed Product Will Not Infringe Independent Claims 1 and 12 of the '209 Patent Under the Doctrine of Equivalents**

DRL's proposed product will not infringe independent claims 1 and 12 of the '209 patent under the doctrine of equivalents. Amendments made by Lilly during the prosecution of the ancestor '807 and '821 applications preclude Lilly from extending the meaning of pemetrexed disodium to cover the pemetrexed ditromethamine in DRL's proposed product. Further, the nature of the narrowly-worded claims forecloses Lilly from arguing that another pemetrexed salt is equivalent to the claimed pemetrexed disodium.

      **i.**      **Amendment-Based Prosecution History Estoppel**

There can be no infringement of the claims of the '209 patent under the doctrine of equivalents due to amendment-based prosecution history estoppel. The '209 patent is a division of the '807 application, now abandoned, which is a division of the '821 application, now U.S. Patent No. 7,053,065 ("the '065 patent"). During prosecution of the '821 application, Lilly amended the pending claims by replacing the broad term "antifolate" with the limitation "pemetrexed disodium". Amendment and Response dated January 25, 2005, pp. 6-11. Lilly also made the same narrowing amendment to the term "antifolate" in the November 29, 2005 preliminary amendment in the prosecution of the '807 application. *See* Preliminary Amendment, November 29, 2005, p. 3. As a result, Lilly is presumptively precluded by amendment-based prosecution history estoppel from extending the meaning of pemetrexed disodium to cover pemetrexed ditromethamine. *Festo*, 535 U.S. at 737 ("A patentee who narrows a claim as a condition for obtaining a patent disavows his claim to the broader subject matter, whether the amendment was made to avoid the prior art or to comply with §112."); *Duramed Pharms., Inc. v.*

*Paddock Labs., Inc.*, 644 F.3d 1376, 1380 (Fed. Cir. 2011) (when patentees narrowed the scope of the patent claims in an amendment in response to a prior art rejection, a presumption of prosecution history estoppel applies).

## ii. Narrow Language in the Claims and Specification Precludes the Use of the Doctrine of Equivalents to Reach Beyond Pemetrexed Disodium

There can be no infringement under the doctrine of equivalents because the claims of the '209 patent are narrowly worded to require pemetrexed disodium, even though the use of a salt equivalent for the same purpose was clearly foreseeable. Tellingly, the specification and claims of the '209 patent neither mention nor suggest any other alternative salt form of pemetrexed. However, before the invention of the '209 patent, the prior art, e.g., U.S. Patent No. 5,344,932 (issued September 6, 1994) ("the '932 patent), explicitly disclosed the use of various pemetrexed salt forms, including pemetrexed salt of a mono substituted amine. *See* the '932 patent, col. 2, lines 40-49 ("Pharmaceutically acceptable salts [of pemetrexed] with bases include those formed from the alkali metals, alkaline earth metals, non-toxic metals, ammonium, and mono-, di- and tri substituted amines, such as for example the sodium, potassium, lithium, calcium, magnesium, aluminum, zinc, ammonium, trimethylammonium, triethanolammonium, pyridinium, and substituted pyridinium salts. The mono and disodium salts, particularly the disodium salt, are advantageous.")

Because Lilly claimed narrowly and limited the salt form to pemetrexed disodium, even though the use of other pemetrexed salts were clearly foreseeable, the scope of the claimed invention is limited to the use of pemetrexed disodium for the claimed methods. Lilly should

have foreseen the limiting potential of the term "disodium." If Lilly desired broader patent protection to cover the use of other salt forms, it could have done so by using standard broader claim terms, *e.g.*, "pemetrexed and its pharmaceutically acceptable salts," instead of narrowly claiming "pemetrexed disodium" during prosecution; however it did not. *See Sage Prods. v. Devon Indus., Inc.*, 126 F.3d 1420, 1425 (Fed. Cir. 1997) ("[A]s between the patentee who had a clear opportunity to negotiate broader claims but did not do so, and the public at large, it is the patentee who must bear the cost for its failure to seek protection for this *foreseeable* alteration of its claimed structure") (emphasis added). Instead, Lilly chose to limit the claims to only pemetrexed disodium, which Lilly specifically characterized as "advantageous" over other pemetrexed salts. The '932 patent, col. 2, lines 40-49.[2]

By claiming narrowly, Lilly, as the patentee, "did not put others of skill in the art on notice" that other pemetrexed salt forms were covered by the patent. The patentee could have claimed broadly instead of limiting the claim to pemetrexed disodium. Having failed to do so, they are not entitled to rely on the doctrine of equivalents to cover alleged pemetrexed disodium equivalents. *Tanabe Seiyaku Co. v. U.S. Int'l Trade Comm'n*, 109 F. 3d 726, 732 (Fed. Cir. 1997) (finding no infringement under the doctrine of equivalents in part because the patentees could have used the term "lower alkyl ketone" to describe a class of ketone solvents including both the claimed acetone and the accused equivalent, yet chose not to do so).

Accordingly, DRL's proposed product would not infringe independent claims 1 and 12 of the '209 patent under the doctrine of equivalents. For the foregoing reasons, the manufacture,

---

2 The '932 patent is also listed in the Orange Book under ALIMTA®. The '932 patent is owned by Princeton University and licensed exclusively to Lilly.

use, sale, or offer for sale in the United States or importation into the United States of DRL's proposed product would not infringe independent claims 1 or 12 of the '209 patent, either literally or under the doctrine of equivalents.

### c. DRL's Proposed Product Will Not Infringe Dependent Claims 2-11 and 13-22 Either Literally Or Under the Doctrine of Equivalents

Claims 2-11 and 13-22 of the '209 patent depend, either directly or indirectly, from independent claims 1 or 12, and consequently all require the administration of pemetrexed disodium in an amount that is capable of providing a therapeutic benefit to the patient in need thereof. DRL's proposed product cannot infringe these claims because, as discussed above, DRL's product will not infringe independent claims 1 and 12 of the '209 patent either literally or under the doctrine of equivalents. *Wahpeton Canvas Co., Inc. v. Frontier, Inc.*, 870 F.2d 1546, 1552 (Fed. Cir. 1989) ("One who does not infringe an independent claim cannot infringe a claim dependent on (and thus containing all the limitations of) that claim.").

### 3. No Induced Infringement of Any of the Claims of the '209 Patent

### a. Direct Infringement of the '209 Patent by Third Parties Is a Prerequisite to Liability for Induced Infringement

"Inducement requires proof that the accused infringer knowingly aided and abetted another's direct infringement of the patent." *Warner-Lambert*, 316 F.3d at 1363 (citation omitted). "[L]iability for inducement must be predicated on direct infringement." *Limelight Networks, Inv. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2117 (2014). The patentee "must first prove that the defendants' actions led to direct infringement" of the patent-in-suit by third parties. *Dynacore*, 363 F.3d at 1274; *see also Southwall*, 54 F.3d at 1575 ("To establish literal

infringement, every limitation set forth in a claim must be found in an accused product, exactly.").

Thus, it will be Lilly's burden, in the first instance, to identify instances of direct infringement of the '209 patent by, for example, physicians who followed the instructions set forth in DRL's label. Lilly will be unable to do so. First, as discussed above, all of the claims of the '209 patent call for the administration of pemetrexed *disodium*. DRL's proposed label, on the other hand, calls for the administration of pemetrexed *ditromethamine*. Moreover, as explained above, prosecution history estoppel bars Lilly from asserting that pemetrexed ditromethamine is equivalent to pemetrexed disodium. Second, Lilly's label instructs that its pemetrexed product is to be prepared for administration through reconstitution and further dilution in *0.9% sodium chloride* injection. In contrast, DRL's proposed label instructs that its product is to be reconstituted and further diluted in only 5% *dextrose* injection. DRL's proposed label, Section 2.6.

### b. Mere Knowledge of Possible Infringement by Others Does Not Constitute Inducement of Infringement

Furthermore, mere knowledge of possible infringement by third parties "does not amount to inducement; specific intent and action to induce infringement must be proven." *Warner-Lambert*, 316 F.3d at 1364 ("Thus, if a physician, without inducement by Apotex, prescribes a use of gabapentin in an infringing manner, Apotex's knowledge is legally irrelevant.").

Under *Warner-Lambert* and its progeny, Lilly would need to show "more than the mere sale of the product" to establish specific intent to induce infringement. *Acorda*, 2011 WL 4074116, at *14. Lilly would need to show that DRL's label "encourage[d], recommend[ed] or

promote[d] infringement." *See Takeda*, 785 F.3d at 631. Given the differences between DRL's
proposed product label and the '209 patent claims, Lilly would be unable to do so.

"The mere existence of direct infringement by physicians, while necessary to find
liability for induced infringement, is not sufficient for inducement. As stated in *Warner-Lambert*
in the ANDA context, it is well-established that 'mere knowledge of possible inducement by
others does not amount to inducement; specific intent and action to induce infringement must be
proven.'" *Takeda*, 785 F.3d at 631, *quoting Warner-Lambert*, 316 F.3d at 1364.

Here, there are several facts that would point away from a finding of specific intent to
induce infringement.

### i.     DRL's Design-Around Points Away From Specific Intent to Induce Infringement

"Designing around patents is . . . one of the ways in which the patent system works to the
advantage of the public in promoting progress in the useful arts, its constitutional purpose."
*Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 932 F.2d 1453, 1457 (Fed. Cir. 1991). In assessing
intent to induce infringement, some courts have taken into account the extent to which the
accused infringer did or did not attempt to avoid the patent claims. *See, e.g., Riverbed Tech.,
Inc. v. Silver Peak Sys., Inc.*, No. 11-484, 2014 U.S. Dist. LEXIS 127651, at *11-12 (D. Del.
Sept. 12, 2014) (in finding that the jury had sufficient evidence to conclude the accused infringer
had the requisite knowledge for indirect infringement, commenting that "Riverbed chose not to
design around, remove, or instruct customers not to use the accused features."); *cf. Otsuka*, 2015
U.S. Dist. LEXIS 50082, at *52-53 (that the defendants "actively and voluntarily removed any
reference to the allegedly infringing indication, in turn, belies any suggestion that these

Defendants acted with the specific intention to encourage infringement. Indeed, this affirmative action would seem to negate any reasonable inference of an active intent to induce infringement.").

Indeed, in a pre-trial submission in connection with the invalidity trial in the Southern District of Indiana, Lilly chastised the defendants for *not* designing around the '209 patent: "ALIMTA sells over a billion dollars a year in the United States alone. Defendants, therefore, have a significant financial incentive to try to design around the claimed invention by taking the necessary steps to seek permission from the FDA to market pemetrexed without infringing the '209 patent." *Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, No. 10-1376, Docket Entry ("D.E.") 264, at 14 (S.D. Ind. July 1, 2013) (Lilly's Opposition to Defendants' Motion in Limine to Exclude Plaintiff's Evidence of Alleged Commercial Success). This is what DRL has done. DRL designed around the claimed invention of the '209 patent through the use of pemetrexed ditromethamine rather than pemetrexed disodium and the use of dextrose for reconstitution and further dilution. DRL is taking "the necessary steps to seek permission from the FDA to market pemetrexed without infringing the '209 patent" through the filing of its 505(b)(2) application.

### ii.  Lilly Cannot Show that DRL's Proposed Product Label "Instructs" an Infringing Use

The instructions on DRL's product label also point away from specific intent to induce infringement. As the court stated in *Acorda*, the determination of whether an ANDA label can lead to an inference of specific intent to induce infringement "depends on how explicitly the instructions suggest the infringement, any direct evidence, the Court's fact-finding conclusions and the surrounding circumstances." *Acorda*, 2011 WL 4074116, at *16.

The instructions for the administration of pemetrexed both in Lilly's FDA-approved product label and DRL's proposed product label are explicit. Furthermore, the differences between the two sets of instructions point away from a finding of specific intent to induce infringement. As discussed above, Lilly's label instructs that its pemetrexed product is to be reconstituted in 0.9% Sodium Chloride Injection. Lilly's product label, p. 4, Paragraph 2.6 Indeed, "[r]econstitution and further dilution prior to intravenous infusion is *only* recommended with 0.9% Sodium Chloride Injection (preservative free)." *Id.* (emphasis added). DRL's pemetrexed product, on the other hand, is to be reconstituted in a 5% dextrose injection and then further diluted into a solution of 5% dextrose injection. DRL's Proposed Label, Section 2.6, subparagraphs 3, 5. DRL's proposed label further states that "[r]econstitution and further dilution prior to intravenous infusion is *only* recommended with 5% Dextrose Injection (preservative free)." *Id.*, Section 2.6, subparagraph 6 (emphasis added). The instructions on the product label are determinative for a lack of induced infringement. See *Eli Lilly v. Teva*, 2015 U.S. Dist. LEXIS 112221, at *15. ("[A court] must look to the ANDA Products' labeling to determine, if all the patented steps are followed, [and] whether it would infringe the Asserted Claims.") Based upon DRL's proposed product label, there is no induced infringement.

### iii. There is a Substantial Non-Infringing Use for DRL's Proposed Product Due to the Difference in Salt Form and Reconstitution in Dextrose

DRL's proposed product has a substantial non-infringing use in two respects, as discussed above: (1) the use of a non-infringing salt, pemetrexed ditromethamine; and (2) reconstitution and further dilution in the non-infringing 5% dextrose. *See also* Zhang et al.,

"Physical and Chemical Stability of Pemetrexed in Infusion Solutions," *The Annals of Pharmacotherapy*, 2006, 40, 1082-85 (explaining that pemetrexed has a similar stability in either saline or in dextrose). Thus, Zhang confirms the existence of a substantial non-infringing use because pemetrexed can be used in either dextrose (*i.e.,* a non-infringing use) or in saline.[3]

Indeed, the FDA has accepted DRL's proposed non-infringing use, that is, DRL's proposal to submit a 505(b)(2) application for the non-infringing uses of pemetrexed ditromethamine in place of pemetrexed disodium as the API, and of 5% dextrose as "an alternate diluent" to 0.9% sodium chloride injection.

### 4.   No Contributory Infringement of the '209 Patent

Lilly will not be able to establish contributory infringement under 35 U.S.C. § 271(c), either.   As noted above, the existence of substantial non-infringing uses defeats a claim for contributory infringement as a matter of law. *Vita-Mix*, 581 F.3d at 1328. "[N]on-infringing uses are substantial when they are not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." *Id.* at 1327.

Here, the FDA has accepted DRL's proposal to submit a 505(b)(2) application for a product in which pemetrexed ditromethamine is used in place of pemetrexed disodium as the API, and of 5% dextrose is used as "an alternate diluent" to 0.9% sodium chloride injection. As explained above, both of these substitutions were made as part of a design-around to avoid infringement. That the FDA would accept DRL's proposal signifies that DRL's non-infringing use for its proposed product is "not unusual, far-fetched, illusory, impractical, occasional,

---

3 Notably, the study discussed in the Zhang reference was supported by a grant from Lilly. *Id.* at 1085.

aberrant, or experimental." *Vita-Mix*, 581 F.3d at 1327. Accordingly, there would be no contributory infringement.

## V. CONCLUSION

The foregoing provides the detailed factual and legal basis in support of DRL's position that the claims of the '209 patent are invalid, unenforceable and/or will not be infringed by the manufacture, use, sale, offer to sell, or importation into the United States of DRL's Proposed Product.

DRL expressly reserves the right to modify or supplement this memorandum as additional information may become available, and to assert any other arguments or defenses relating to non-infringement, invalidity, and/or unenforceability of the claims of the patents discussed herein, including in the course of any future litigation involving DRL's 505(b)(2) submission.

Please note that because there is no statutory authority mandating that the NDA holder must keep confidential a filer's detailed factual and legal basis supporting a certification pursuant to 21 U.S.C. § 355(b)(2)(A)(iv) and 21 C.F.R. § 312.52(c)(6), DRL may not have included in this detailed factual and legal basis proprietary DRL information that may be made available pursuant to the Offer of Confidential Access made in the accompanying Notice Letter.