# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

|  |  |
|---|---|
| ELI LILLY AND COMPANY, | |
| Plaintiff/Counterclaim Defendant, | Civil Action No. 1:16-308-TWP-MPB |
| v. | |
| DR. REDDY'S LABORATORIES, LTD., and DR. REDDY'S LABORATORIES, INC., | |
| Defendants/Counterclaimants. | |

## SEALED COVER SHEET

### DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT

Defendants, Dr. Reddy's Laboratories, Ltd. and Dr. Reddy's Laboratories, Inc. (collectively, "DRL"), hereby file under provisional seal, pending their contemporaneously filed Motion to Seal, their Brief in Support of Motion for Summary Judgment of Noninfringement. As required by Local Rule 5-11, opposing counsel has been served with this Cover Sheet and said document.

Respectfully submitted,

Dated: July 31, 2017

/s/ Stephen E. Arthur
Stephen E. Arthur, Atty. No. 4055-49
Rory O'Bryan, Atty. No. 9707-49
HARRISON & MOBERLY, LLP
10 West Market Street, Suite 700
Indianapolis, Indiana 46204
Telephone:    (317) 639-4511
Facsimile:    (317) 639-9565
sarthur@harrisonmoberly.com
robryan@harrisonmoberly.com

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS  DIVISION

ELI LILLY  AND COMPANY,

       Plaintiff/Counterclaim  Defendant,

       v.

DR. REDDY'S LABORATORIES, LTD., and
DR.  REDDY'S LABORATORIES, INC.,

       Defendants/Counterclaimants.

Civil  Action No. 1:16-308-TWP-MPB

---

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT

---

HARRISON & MOBERLY, LLP
10 West Market Street, Suite 700
Indianapolis, Indiana 46204
Tel: (317) 639-4511
Fax: (317) 639-9565

Attorneys for Defendants,
Dr. Reddy's Laboratories, Ltd. and
Dr. Reddy's Laboratories, Inc.

Of counsel:

Jeffery B. Arnold, Esq.
HOLLAND & KNIGHT LLP
1180 West Peachtree Street NW
Atlanta, Georgia 30309

Charles A. Weiss, Esq.
Merri C. Moken, Esq.
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019

# TABLE OF CONTENTS

Introduction ................................................................................................................- 1 -

Summary of Facts and Procedural History ..........................................................- 2 -

Statement of Material Facts Not in Dispute.........................................................- 4 -

Legal Argument .........................................................................................................- 19 -

I.      DRL does not directly infringe because it does not treat patients, and thus does not
        practice the claimed method ..............................................................................- 20 -

II.     There is no literal infringement by healthcare providers ...............................- 21 -

        A.      ████████████████████████████████.......................................- 21 -

        B.      ████████████████████████████..........................................- 22 -

III.    There is no infringement by healthcare providers under the doctrine of equivalents...- 23 -

        A.      Lilly's equivalents claim is barred by prosecution history estoppel.................- 23 -

                1.      Lilly narrowed its claims during prosecution, triggering a presumption
                        of prosecution history estoppel ...........................................................- 23 -

                2.      Lilly cannot rebut the presumption of prosecution history estoppel.....- 24 -

        B.      Lilly's equivalents claim is barred by the disclosure-dedication rule...............- 30 -

        C.      Even if not barred by prosecution history estoppel or the disclosure-
                dedication rule, Lilly's doctrine of equivalents claim fails because it cannot
                prove that pemetrexed ditromethamine in the DRL product is a patent-law
                equivalent of pemetrexed disodium as claimed in the '209 patent ...................- 31 -

IV.     Even if there were direct infringement by healthcare providers, Lilly cannot prove that
        DRL is liable for their actions under a theory of indirect infringement...........................33

        A.      Lilly cannot prove that DRL would induce infringement under 35 U.S.C. §
                271(b)...............................................................................................................- 33 -

        B.      Lilly cannot prove contributory infringement under 35 U.S.C. § 271(c) .........- 34 -

Conclusion ..................................................................................................................- 35 -

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

AstraZeneca Pharms. LP v. Apotex Corp.,
  669 F.3d 1370 (Fed. Cir. 2012)..................................................................20

Aventis Pharms., Inc. v. Barr Labs., Inc.,
  335 F. Supp. 2d 558 (D.N.J. 2004) .......................................................30, 31

Biagro Western Sales, Inc. v. Grow More, Inc.,
  423 F.3d 1296 (Fed. Cir. 2005)..................................................................28

Biovail Corp. Intern. v. Andrx Pharmaceuticals, Inc.,
  239 F.3d 1297 (Fed. Cir. 2001)..................................................................24

Celotex Corp. v. Catrett,
  477 U.S. 317 (1986)...............................................................................1, 19

Chimie v. PPG Indus. Inc.,
  402 F.3d 1371 (Fed. Cir. 2005)..................................................................29

Commil USA, LLC v. Cisco Systems, Inc.,
  135 S. Ct. 1920 (2015)...............................................................................33

DSU Med. Corp. v. JMS Co.,
  471 F.3d 1293 (Fed. Cir. 2006)..................................................................33

Duramed Pharms., Inc. v. Paddock Labs., Inc.,
  644 F.3d 1376 (Fed. Cir. 2011)..................................................................27

Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,
  344 F.3d 1359 (Fed. Cir. 2003)..........................................................25, 28, 29

Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,
  535 U.S. 722 (2002)...........................................................................20, 24, 25

Glaxo Wellcome, Inc. v. Impax Labs., Inc.,
  356 F.3d 1348 (Fed. Cir. 2004)..............................................................26, 27

Global–Tech Appliances, Inc. v. SEB S. A.,
  563 U.S. 754 (2011)...................................................................................33

Medtronic, Inc. v. Mirowski Family Ventures, LLC,
  134 S. Ct. 843 (2014)..................................................................................19

Modrowski v. Pigatto,
    712 F.3d 1166 (7th Cir. 2013) ...........................................................................1, 19

Novartis Corp. v. Ben Venue Labs.,
    271 F.3d 1043 (Fed. Cir. 2001)..........................................................................1, 19

PSC Computer Prods., Inc. v. Foxconn Int'l, Inc.,
    355 F.3d 1353 (Fed. Cir. 2004)..........................................................................30, 31

Ranbaxy Pharms., Inc. v. Apotex, Inc.,
    350 F.3d 1235 (Fed. Cir. 2003)...............................................................................27

Sage Prods., Inc. v. Devon Indus., Inc.,
    126 F.3d 1420 (Fed. Cir. 1997)...............................................................................31

Schwarz Pharma, Inc. v. Paddock Labs., Inc.,
    504 F.3d 1371 (Fed. Cir. 2007)..........................................................................28, 29

Takeda Pharm. U.S.A., Inc. v. West-Ward Pharm. Corp.,
    785 F.3d 625 (Fed. Cir. 2015)................................................................................34

Tronzo v. Biomet, Inc.,
    156 F.3d 1154 (Fed. Cir. 1998)...............................................................................32

United Therapeutics Corp. v. Sandoz, Inc.,
    No. 12-CV-01617, 2014 WL 4259153 (D.N.J. Aug. 29, 2014) ............................34

Vita-Mix Corp. v. Basic Holding, Inc.,
    581 F.3d 1317 (Fed. Cir. 2009)...............................................................................34

Warner Lambert Co. v. Apotex Corp.,
    316 F.3d 1348 (Fed. Cir. 2003)...............................................................................21

Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,
    520 U.S. 17 (1997)..................................................................................................28

**Statutes and Rules**

35 U.S.C. § 271(a) ...........................................................................................................20

35 U.S.C. § 271(b) ...............................................................................................2, 21, 33

35 U.S.C. § 271(c) ...............................................................................................2, 21, 34

Fed. R. Civ. P. 56(a) ........................................................................................................19

## INTRODUCTION

Defendants (collectively, "DRL") respectfully submit this brief in support of their motion for summary judgment of noninfringement of U.S. Patent 7,772,209 ("the '209 patent").

Because the claims of Lilly's '209 patent are directed to methods of treating patients, and defendants are pharmaceutical companies that do not treat patients, Lilly must rely on a theory of indirect infringement.  To prevail on indirect infringement Lilly must prove:

(i)     direct infringement by the healthcare providers that will treat patients using the product for which DRL has sought FDA approval, and

(ii)    that DRL is liable for the infringement by such persons by either (a) DRL's inducement of infringement by such persons, or (b) contributory infringement.

On each of these elements, Lilly has the burden of proof.  On each, DRL points out herein that there is an absence of evidence supporting Lilly's case, which puts the burden on Lilly to come forward with sufficient evidence on the essential elements of its case.  Because Lilly cannot do so, DRL is entitled to summary judgment.[1]

Lilly's claims that direct infringement occurs both literally and under the doctrine of equivalents fail on multiple, independent grounds.  ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Its doctrine of equivalents claim fails on legal grounds and fails for lack of proof.  First, it is barred by prosecution history estoppel because Lilly narrowed the claims of the '209 patent during prosecution to overcome the PTO's prior-art rejection.  Specifically, Lilly narrowed its claims to "pemetrexed disodium" after the PTO rejected its attempt to broadly claim "antifolates" generally.  This creates a presumption, which Lilly cannot rebut, that it is estopped

---

[1] Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Modrowski v. Pigatto, 712 F.3d 1166, 1168 (7th Cir. 2013); Novartis Corp. v. Ben Venue Labs., 271 F.3d 1043, 1046 (Fed. Cir. 2001).

from asserting that <u>unclaimed</u> antifolates, like pemetrexed ditromethamine, are equivalent to pemetrexed disodium.  Second, the disclosure-dedication rule prohibits use of the doctrine of equivalents to capture subject matter that was disclosed in the specification but left unclaimed.  It applies here because the '209 patent disclosed other salts and forms of pemetrexed but failed to claim them.  This means that Lilly cannot now assert that other pemetrexed salts, like tromethamine, are equivalent.

Lilly's doctrine of equivalents claim fails on the merits even if not barred at the threshold.  The drug in DRL's product is pemetrexed ditromethamine, not pemetrexed disodium as required by the '209 patent claims.  Lilly may argue the <u>medical</u> equivalence of these different drugs, but cannot come forward with sufficient evidence under the legal standard for <u>patent</u> equivalence.

Finally, Lilly's claim that DRL induces or contributes to infringement by healthcare providers under 35 U.S.C. §§ 271(b) and (c) requires it to further prove that DRL both (i) directs them to carry out the acts that constitute infringement, and (ii) knows and specifically intends that they infringe.  Lilly must prove both to prevail, but cannot present evidence of either.

## SUMMARY OF FACTS AND PROCEDURAL HISTORY

DRL's summary of the facts is not intended to replace its statements in accordance with Local Rule 56-1(a), but to provide in narrative form a roadmap of the issues.

Lilly's product Alimta was approved in 2004.  Lilly listed U.S. Patent No. 5,344,932 ("the '932 patent") in the Orange Book and asserted that patent against a number of ANDA filers beginning in 2008.  The '932 patent (including pediatric exclusivity) expired January 2017.  The '209 patent at issue in this case is directed to certain methods of administering pemetrexed disodium after pretreatment with folic acid and vitamin $B_{12}$.  With pediatric exclusivity, the '209 patent does not expire until May 2022, providing Lilly with an additional 5 years of exclusivity.

Unlike some ANDA filers that sought to market a generic of Alimta with the identical drug (pemetrexed disodium) claimed in the '209 patent, DRL set out to avoid infringing the '209 patent by designing a different product.  DRL ran experiments to investigate different salts, and chose tromethamine.  Tromethamine and sodium are about as far apart as two cationic salts can be:  sodium is an inorganic, metallic salt, while tromethamine is an organic, nonmetallic salt.[2]

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████.

In April 2017, the magistrate judge granted DRL's motion to strike portions of Lilly's experts' reports that presented new theories and grounds of infringement that Lilly failed to disclose in infringement contentions.  ECF No. 96.  Because Lilly's objections to that Order are

_____

[2] The compounds are called pemetrexed <u>di</u>sodium and pemetrexed <u>di</u>tromethamine because each molecule of pemetrexed has two negative charges, and thus binds two positively-charged sodium atoms or tromethamine molecules.

sub judice, this motion does not rely on the Order granting the motion to strike.[3]  Resolution of

Lilly's objections will impact what evidence Lilly is able to present in opposition to this motion.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### A.    ADMINISTERING PEMETREXED DISODIUM

1.      All asserted claims 9-10, 12-15, 18-19, and 21-22 of U.S. Patent No. 7,772,209 (the

'209 patent), are directed to a "method of administering pemetrexed disodium" and require either

"administering an effective amount of pemetrexed disodium" or "administration of pemetrexed

disodium."  ECF No. 130 at 2; A7-A8[4] ('209 patent).

2.      Lilly's expert Dr. Chabner testified that all data and testing supporting the claims in the

'209 patent comes from examples using Lilly's drug Alimta.  A269 at 23:25-24:4.

3.      Dr. Chabner testified that Alimta starts as solid pemetrexed disodium, and is

reconstituted and diluted in saline when prepared for injection.  A269-A270 at 24:15-25:6; A854

at §2.6, A862 at § 11 (Alimta label).

4.      Dr. Chabner further testified that the only source of pemetrexed disodium in the '209

patent was Alimta, and that the only administration of pemetrexed disodium shown in the '209

patent was of a solution of pemetrexed disodium formed by dissolving the solid compound

pemetrexed disodium into solution.  A270 at 25:7-10; 26:8-11; 26:16-20.

5.      In his opening expert report ("Chabner OR") at A475-A476 at ¶¶ 49-50, Dr. Chabner

described what a solution of pemetrexed disodium is, stating the "administration of pemetrexed

disodium" limitation is met by "administration of pemetrexed disodium when dissolved in

solution. . . ."); see also A476 at ¶ 50 ("a solution that contained Alimta in dissolved form. . . ."

---

[3] For the avoidance of doubt, DRL's presentation of this motion without reliance on the Order granting its motion to strike is not a waiver of DRL's positions that some of Lilly's theories should be stricken from this case and that Lilly's objections should be overruled.

[4] "A_" refers to the page(s) of the appendix attached to the July 31, 2017 Declaration of Charles A. Weiss in Support of Defendants' Motion for Summary Judgment of Noninfringement.

6. Dr. Chabner further noted in A475-A476 at ¶50 (Chabner OR) that:

> administration of pemetrexed disodium when dissolved in solution . . . satisfies the '209 patent claim limitations concerning administration of pemetrexed disodium. That understanding is consistent with the '209 patent specification. . . . [T]he injection would be understood by the POSA to be a solution that contained ALIMTA in dissolved form . . . . [A]s the language of the '209 patent makes clear, it is still be [sic] understood as 'treat[ment] with ALIMTA[(pemetrexed disodium)] . . . by intraperitoneal injection,' notwithstanding the dissociation of pemetrexed disodium into pemetrexed and sodium ions.

7. Lilly referred to each of "Alimta" and "pemetrexed disodium" as compounds. A232.

## B.  THE DRL PROPOSED NDA PRODUCT

8. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████

9. In its interrogatory response Lilly concedes that the DRL product as provided in solid form or as prepared for infusion, does not contain the compound pemetrexed disodium. A887, A890-A891.

10. In its interrogatory response Lilly concedes that when the DRL product is prepared for administration, the compound pemetrexed disodium is not dissolved into solution. A891, A894.

11. Lilly's expert Dr. Pinal testified that "active ingredient" in a parenteral pharmaceutical refers to the solid salt of the drug, not the drug form that is administered. A346 at 103:1-12; A642 at FN1 (Pinal Opening Expert Report ("Pinal OR")).

12. Dr. Pinal agrees "pemetrexed ditromethamine [is] the active ingredient in DRL's NDA Products . . . ." A642 at ¶15 (Pinal OR); A346 at 103:17-20 (Pinal Tr.).

13. Dr. Pinal testified that the active ingredients in Alimta and in the DRL product are

different chemical entities with different properties.  A346 at 103:13-104:11.

14.  Lilly's fact witness Dr. Shih, a chemist, testified that different salt forms of a compound are chemically distinct entities. A400 at 50:8-9, 13-21; <u>see also</u> A398.2 at 21:14-17.

**C.  THE DRL LABEL**

15. 

16.  Dr. Chabner testified that reconstitution and dilution of a drug is based on the manufacturer's label.  A273 at 40:2-5.

17.  Dr. Pinal stated that 

██████████████

**20.** ████████████████████████████████

████████████████████████████████████

**21.** ██████████████████████████████████████

██████████████████████████

**22.** ██████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

**23.** ████████████████████████████

████████████████████████████████

**24.** ████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████

**D.     ADMINISTRATION OF THE DRL NDA PRODUCT**

**25.** ████████████████████████████████

████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████

████████████████████████████████

**26.** Dr. Chabner testified that he does not himself prepare and give IV drugs; administration is the nurse's responsibility.  A270 at 27:24-28:1; A271 at 30:7-31:5; A297 at 165:13-20; <u>see also</u> A751-A757 at ¶¶ 25, 27-29, 32, 36 (Waldron Report); A658 at ¶¶ 45 (Seckl Report).

**27.** Dr. Chabner was unable to explain the physical set-up of the IV administration he

opined would be used for administering the DRL product when used in combination with cisplatin, including how the infusion bags would be hung, and what the nurse would use to flush the infusion lines. A279 at 62:14-16, 62:25-63:9; A290 at 120:12-21.





██████████████████████████████

        ████████████████████████████

        ████████████████████████████

        ████████████

        ██  ██████████████████████

        ████████████████████████████

        ██████████

        ██  ██████████████████████

        ████████████████████████████

        ██████████

        ████

        ██  ██████████████████████

        ████████████████████████████

        ████████████████████████████

        ████████████████████████████

        ████████████████████████████

        ████████████

**35.** ████████████████████████████████

██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████

**E.** **DRL'S AVOIDANCE OF THE '209 PATENT; NO KNOWLEDGE OF, OR INTENT TO INDUCE INFRINGEMENT**

**36.** ████████████████████████████████

██████████████████████████████████

**37.** ██████████████████████████

        ████████████████████████

        ████████████████████████

        █████████████████████ ███

        ████████████████████████

        ████████████████████████



**38.** Dr. Chabner testified that DRL intended to avoid infringing the '209 patent.  A275 at 47:20-48:5; <u>see also</u> A474-A475 at ¶ 48, A479 at ¶ 59, A481 at ¶ 63 (at p 30) (Chabner OR).

**39.**

**40.**

**41.**

**42.**

█████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████
████████████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████████████████████
███

███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████

**43.** ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

**44.** ████████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████████

**45.** ████████████████████████████████████████████████████

███████████████████████████████████████████████

**46.** ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

██████████████

## F. PROSECUTION HISTORY ESTOPPEL AND DEDICATION-DISCLAIMER

**47.** The '209 patent issued from App'n 11/776,329, which is a division of App'n 11/288,807, filed in November 2005, which is a division of App'n 10/297,821("the '821 App'n"), filed as App'n PCT/US01/14860 in June 2001. A1 at (21), (62) ('209 patent).

**48.** The claims of the '821 App'n as filed were directed to methods, uses and products, all requiring an "antifolate," and some dependent claims specified the "antifolate is ALIMTA." A208-A211 (PCT/US01/14860).

**49.** One of those claims read:

> 2. (Original) A method of reducing the toxicity associated with the administration of an antifolate to a mammal comprising administering to said mammal an effective amount of said antifolate in combination with a methylmalonic acid lowering agent.

A213; see also A208 ('821 App'n Pros. Hist.).

**50.** In a September 2004 Office Action [A221], the PTO rejected claim 2 as anticipated by the prior art Arsenyan reference and stated:

> Arsenyan et al. teaches a method of pretreating mammals (mice) with various types of cancer with methylcobalamin (a vitamin B12 derivative which reduces methylmalonic acid) then administering methotrexate (an antifolate), and reports increased tumor inhibition and survival with methylcobalamin treatment.

**51.** This was the only prior art-based rejection that the PTO made with respect to independent claim 2. A216-A226 ('821 App'n Pros. Hist.).

**52.** In response, Lilly amended claim 2 as follows, and stated that Arsenyan did not disclose the use of pemetrexed disodium as presently claimed:

> 2. (Currently Amended) A method of reducing the toxicity

- 13 -

associated with the administration of ~~an antifolate~~ pemetrexed disodium to a ~~mammal~~ human comprising administering to said ~~mammal~~ human an effective amount of ~~said antifolate~~ pemetrexed disodium in combination with a methylmalonic acid lowering agent, selected from vitamin $B_{12}$ or a pharmaceutical derivative thereof. [A230]

\* \* \*

There is no disclosure in Arsenyan et al. of the invention as presently claimed. In particular, Arsenyan et al. does not disclose pemetrexed disodium and does not disclose the use of vitamin B12 or a pharmaceutical derivative to reduce the toxicity associated with the administration of pemetrexed disodium, or for that matter any other antifolate per the following discussion. In view of the present amendments and the comments above, Applicants respectfully request withdrawal of this rejection. [A233]

**53.** Lilly admits it narrowed "antifolate" to "pemetrexed disodium" in response to the PTO's rejection of claim 2 for anticipation in view of the prior art. A324 at 128:8-16 (McGraw Tr.) and referenced document, A233 ('821 App'n Pros. Hist., Jan. 2005 Amendment and Remarks); A882-A884 (Lilly's Supp. Response to Interrog. No. 8).

**54.** Dr. Chabner testified that the term "antifolate" in the original claims would have embraced a large number of antifolates and their salts, and salts of pemetrexed other than the disodium salt. A295 at 157:6-159:15 (Chabner Tr.); see also A485 at ¶ 83 (Chabner OR) ("the claims encompassed administration of any antifolate").

**55.** In a May 2005 Office Action, the PTO withdrew the anticipation rejections as a direct result of the amendments Lilly made to these claims, stating:

The rejection of claims 2, 7, 10, and 31 under 35 U.S.C. § 102(b) over Arsenyan et al. has been **withdrawn** in view of amendments to the claims. [A241 (emphasis in original)].

**56.** ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████



**57.**  Dr. Desai, Lilly's in-house patent attorney, testified that she used "pemetrexed disodium" in the claims of the '329 App'n "because the claim was directed to our compound that is the product Alimta." A301 at 66:16-24, 67:17-21; A170-A172 ('329 Pros. Hist.).

**58.**  Dr. Desai testified that Lilly chose "pemetrexed disodium" rather than an alternate term for "antifolate" because the same term is continued throughout the prosecution for the applications from the original application. A304 at 79:20-80:1; see also A301 at 67:22-68:2.

**59.**  All claims prosecuted in the applications leading to the '209 patent were either amended to narrow "antifolate" to "pemetrexed disodium" or limited to "pemetrexed disodium" in view of the earlier rejection over Arsenyan.  A325-A327 at 132:19-20, 134:21-135:10, 137:2-11, 138:16-139:5 (McGraw Tr.); A330 at 151:6-152:1; 152:18-152:24 (McGraw Tr.); A230 ('821 App'n Amendment, January 25, 2005); A254 ('821 App'n Amendment, May 26, 2005); A260 (U.S. Patent Application No. 11/288,807, Preliminary Amendment); A168-A174 ('329 App'n, Preliminary Amendment), A175-A178 ('329 App'n, Second Preliminary Amendment); A179-A180 ('329 App'n, Amendment).

**60.**  Dr. Chabner testified that the '209 patent discloses antifolates, which include the salt forms of the compounds:

>    Q. And the -- the antifolates that are discussed in Column 4 of this

segment of 28 through 43 include antifolate salts --

[…]

A. (Deponent viewing exhibit.) They include the names of antifolates. It doesn't -- I think the salt part of it is -- is irrelevant or trans -- tangential.

[…]

A. I don't know what you mean. You know, of course, they're salts because you don't -- you can't put an ion in a bottle. But they're -- they're compounds. [A269 at 21:16-22:5; see also A4 at 4:28-43 ('209 patent).]

**61.** Six of the patents and applications identified in the '209 patent's definition of antifolate disclose antifolate salts that include pharmaceutically acceptable ammonium salts, substituted ammonium salts, mono-substituted ammonium salts, and sodium salts. A41 at 1:49-2:3, A47 at 14:41-47, A57 at 34:44-62 ('838 patent); A11 at 1:60-2:23, A12 at 3:15-21, A20 at 20:19-39 (U.S. Patent 4,684,653); A23 at 1:53-2:7, A24 at 3:40-47, A26 at 7:51-8:10 (U.S. Patent 4,833,145); A29 at 1:50-2:3, A29-A30 at 2:66-3:4, A33 at 9:41-10:3 (U.S. Patent 4,871,743); A35 at 1:44-49, A36 at 3:4-17, A38 at 8:14-50 (U.S. Patent 4,882,334); A80 at 3:48-51 (EPO 0 239 362); A4 at 4:38-42 ('209 patent); see also A525-A528 at ¶¶ 87-88 (Gokel Report).

**62.** Dr. Chabner testified that tromethamine is a buffer and in ionic form, is a substituted ammonium cation, and more specifically, a monosubstituted ammonium cation. A265 at 6:7-9, 7:3-10 (Chabner Tr.); see also A345 at 97:4-7 (Pinal Tr.).

**63.** ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████

**64.** Dr. Pinal testified that the '838 patent at 1:49-2:3 [A41], discloses pemetrexed and its

salts. A342-A343 at 88:25-90:3.

**65.** Dr. Chabner testified that EPO 0 239 362 ("the '362 App'n") referenced in the '209

patent's definition of "antifolates" discloses antitumor agents and their pharmaceutically

acceptable salts.  A272 at 34:2-35:6; A78-A106 ('362 App'n) at A79 at 16-45.

**66.** Dr. Pinal testified that there are only six substituted amines, including tromethamine,

identified as "FDA-approved salts of prescription drugs in the United States" in Table 34.1 at

A790 (B.D. Anderson *et al.*, *Preparation of Water-Soluble Compounds Through Salt formation*,

739, 741, in <u>The Practice of Medicinal Chemistry</u> (1996)).  A345 at 98:15-19.

**67.** Dr. Pinal testified that of the cationic salt forms identified in USP 2006, five are

substituted amines.  One of these is tromethamine.  A810 at Table III (*Bansal et al.*, *Salt

Selection in Drug Development*, Pharmaceutical Technology 32(3) (2008); A345 at 99:5-100:5.

**68.** Dr. Gokel explained that several FDA-approved drugs for which the active ingredient

was a tromethamine salt, or was tromethamine itself, were commercially available before 2000.

A526 at ¶ 87, A541-A542 at ¶ 116, Table 1, A613-A628 at Exhibit D (Gokel Report).

**69.** Lilly's U.S. Patent No. 6,686,365 ("the '365 patent")[A73-A77], filed in January 2001

and issued in February 2004, claims "A pharmaceutical composition comprising: a) pemetrexed

. . . ."  A76 at 5:20-21; 5:29-33 (claim 2 parenteral form; claim 3 pemetrexed disodium).

**70.** The '365 patent, A75 at 3:10-30, defines the term "pemetrexed" as:

> the stable salts, acids and free base forms thereof.  The term
> includes, for example, the free acid the pharmaceutically
> acceptable alkali metal . . . ammonium, and substituted ammonium
> salts, such as for example, the sodium . . . ammonium . . . and the
> like.  The substituted ammonium salts are one especially preferred
> group of salts. [. . .] The disodium salt of pemetrexed is
> particularly preferred for use in the present formulation.

**71.** Dr. Pinal testified that the '365 patent claims a pharmaceutical composition comprising

pemetrexed and its salts.  A345-A346 at 100:10-101:22.

72. The '365 Patent and the '821 patent application were prosecuted simultaneously by the same Lilly patent attorney, Ms. McGraw.  A73 at (74) ('365 patent); A237.

73. In simultaneously prosecuting the European counterpart to the '209 patent, Lilly narrowed the claims requiring "antifolates" to "pemetrexed," and included a dependent claim to "pemetrexed disodium."  A839-A850 at 2, 11-13 (EP App'n Pros. Hist., Reply and Amendment); *compare* A208-A211 (PCT/US01/14860).

74. ███████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████
█████████████████████████

75. Dr. Chabner agreed that "The '932 patent discloses pemetrexed . . . ." A490 at ¶ 56 (Chabner RR).

76. Claim 1 of the '932 patent includes pemetrexed and its pharmaceutically acceptable salts; claim 3 claims pemetrexed specifically.  A69 at 20:27-51, 20:54-56 ('932 patent); A543 at ¶ 118 (Gokel Report); see also A404 at 70:9-71:3 (Shih Tr.).

77. The '932 patent [A60 at 2:31-47] identifies the claimed pharmaceutically acceptable salts as including those formed with ammonium, mono-substituted amines, and sodium.

## G.     LILLY'S FAILURE TO PROVE EQUIVALENCE

78. Dr. Chabner testified about the function of the antifolates in the method of the '209 patent described at column 3, lines 13-18, and testified the antifolates of the patent have the same function, way and result as he identified for "pemetrexed disodium" of the claims:

> Q.  And it's the antifolate in -- in that administration that is

asserting the chemotherapeutic effect; is that correct?

A. That's -- yes, it is correct. [A266 at 9:6-9; see also A265 at 7:24-8:19.]

Q. So is it fair to say that the antifolates described here inhibit at least one key folate-requiring enzyme? [. . .]

A. Yes. . . .

[. . .]

Q. So the antifolate drugs inhibition of these folate-requiring enzymes is what enables it when it's provided in an effective amount to reduce tumor growth; is that correct?

A. That's right. [A266 at 11:18-12:8; compare A481-A483 at ¶¶ 65, 67, 78 (Chabner OR).]

79. Dr. Chabner also testified that methotrexate (an antifolate disclosed in Arsenyan), has the same function, way and result as he identified for "pemetrexed disodium" of the claims. A292 at 127:5-19; compare A481-A483 at ¶¶ 65, 67, 78 (Chabner OR).

80. Dr. Pinal testified that tromethamine cations can function as buffering agents, whereas sodium cations cannot. A340 at 60:18-25.

81. DRL's expert Dr. Gokel explained that there is no infringement under the doctrine of equivalents through use of the DRL product. A522-A552 at ¶¶77-139 (Gokel Report).

## LEGAL ARGUMENT

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). DRL is entitled to summary judgment because (i) there is an absence of evidence to support Lilly's case, and (ii) Lilly will be unable to present sufficient evidence to create a dispute of material fact regarding any essential element on which it bears the burden of proof. Celotex, 477 U.S. at 322-33; Modrowski, 712 F.3d at 1168; Novartis, 271 F.3d at 1046 (Fed. Cir. 2001).

Because Lilly bears the burden of proving infringement, Medtronic, Inc. v. Mirowski

Family Ventures, LLC, 134 S. Ct. 843, 849 (2014), it is required to come forward with evidence sufficient to carry its burden.  And because Lilly narrowed its claims during prosecution in response to the PTO's rejection, it bears the burden of rebutting the presumption that prosecution history estoppel applies and that it did not surrender the entire subject matter between its original broad claim term ("antifolate") and its amended narrow term ("pemetrexed disodium").  Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 740 (2002).[5]

## I.  DRL DOES NOT DIRECTLY INFRINGE BECAUSE IT DOES NOT TREAT PATIENTS, AND THUS DOES NOT PRACTICE THE CLAIMED METHOD

All asserted claims of the '209 patent are directed to methods of administering pemetrexed disodium (together with folic acid and vitamin $B_{12}$).  ¶ 1.  Unlike Lilly's '932 patent, no claims of the '209 patent are to chemical compounds.  ¶¶ 1, 76.

Direct infringement occurs when a person (without authority from the patentee) makes, uses, offers to sell, sells, or imports a patented invention.  35 U.S.C. § 271(a).  Here, the DRL product is not on the market because it has not received FDA approval (and cannot receive it due to the automatic 30-month stay triggered by Lilly's lawsuit).  Thus, the inquiry is whether DRL will or would infringe based on the content of its NDA.  AstraZeneca Pharms. LP v. Apotex Corp., 669 F.3d 1370, 1376-77 (Fed. Cir. 2012).  Because the '209 patent has only method claims, the only question is whether DRL will "use" the patented method.

DRL is entitled to summary judgment of no direct infringement because Lilly cannot present evidence that either DRL entity will directly infringe the '209 patent by administering the DRL product to patients.  As Lilly pled, both DRL entities are pharmaceutical companies.  ECF 1 (Complaint) ¶¶ 8, 10.  At least in this country, patients are treated by healthcare professionals,

---

[5] Lilly admitted in its interrogatory responses that it narrowed the claims from "antifolate" to "pemetrexed disodium" in response to the PTO's rejection over the prior art.  ¶ 53.  Thus, the presumption of surrender applies, and Lilly's burden to rebut it is triggered.  535 U.S. at 740.

not by pharmaceutical companies. In the absence of evidence that either DRL entity will itself treat patients, each is entitled to summary judgment of no direct infringement. Warner Lambert Co. v. Apotex Corp., 316 F.3d 1348, 1363 (Fed. Cir. 2003).

## II.     THERE IS NO LITERAL INFRINGEMENT BY HEALTHCARE PROVIDERS

Each of Lilly's claims for indirect infringement—based on active inducement of infringement (35 U.S.C. § 271(b)) and contributing to infringement (35 U.S.C. § 271(c)) requires that Lilly first prove that someone else directly infringes (in this case, the healthcare providers who will administer the DRL product). Warner-Lambert, 316 F.3d at 1363. Lilly cannot prove literal infringement by healthcare providers.[6]

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

**A.**      ████████████████████████████████████
████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████     ████████████████████

████████████████████████      This is unlike Lilly's

---

[6] As explained in the next section, infra at 23-33, Lilly also cannot prove that there is infringement by healthcare providers under the doctrine of equivalents.

██████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████. [7]

████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████

**B.**    ████████████████████████████████████████████
████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

_____

[7] ████████████████████████████████████████████████████
████████████████    DRL's answering reports in part
explained that aspects of his opinion were unreliable because these products are administered by
nurses, not doctors.  ¶ 32; <u>see also</u> ¶¶ 26-27.  Lilly then served a rebuttal report from a nurse (Dr.
Hagle.)  Lilly should not be permitted to rely on a new expert with different qualifications on
rebuttal, for issues on which it bears the burden of proof.  Similarly, Lilly should not be
permitted to rely on opinions first expressed in the rebuttal reports of its other experts (Drs.
Chabner and Pinal) for issues on which it bears the burden of proof.

███████████ That makes no sense, is factually unsupported, and is not what Lilly

claimed in the '209 patent.  ¶¶ 1-7; see also ¶¶ 8-14, 35, 42.

## III.    THERE IS NO INFRINGEMENT BY HEALTHCARE PROVIDERS UNDER THE DOCTRINE OF EQUIVALENTS

Lilly cannot prove that healthcare professionals using the DRL product infringe under the

doctrine of equivalents.  First, the doctrine of equivalents is unavailable as a matter of law by

virtue of prosecution history estoppel and the disclosure-dedication rule.  Second, Lilly cannot

show that pemetrexed ditromethamine is equivalent to the pemetrexed disodium of the claims.

### A.    Lilly's equivalents claim is barred by prosecution history estoppel

#### 1.    Lilly narrowed its claims during prosecution, triggering a presumption of prosecution history estoppel

Lilly's original claims in the parent application of the '209 patent were directed to

methods of administering an "antifolate," a broad group that includes old drugs like methotrexate

and newer ones like pemetrexed disodium.  ¶¶ 47-49. The specification defined "antifolate" thus:

> The terms "antifolate" and "antifolate drug" refer to a chemical
> compound which inhibits at least one key folate-requiring enzyme
> of the thymidine or purine biosynthetic pathways . . . by competing
> with reduced folates for binding sites of these enzymes.  Preferred
> examples of antifolates include Tomudex®, as manufactured by
> Zeneca; Methotrexate®, as manufactured by Lederle; Lometrexol®,
> as manufactured by Tularik; pyrido[2,3-d]pyrimidine derivatives
> described by Taylor et al in U.S. Pat. Nos. 4,684,653, 4,833,145,
> 4,902,796, 4,871,743, and 4,882,334; derivatives described by
> Akimoto in U.S. Pat. No. 4,997,838; thymidylate synthase
> inhibitors as found in EPO application 239,362; and most
> preferred, Pemetrexed Disodium (ALIMTA), as manufactured by
> Eli Lilly & Co.

¶ 60.  The PTO rejected Lilly's original claims as anticipated by the prior art (¶¶ 50-51) and Lilly

responded by amending them, replacing the broad term "antifolate" with the narrow, specific

compound "pemetrexed disodium."  ¶¶ 7, 52-53, 55.  The first such rejection and amendment

were made in a parent application to which the '209 patent claims priority, and Lilly repeated

and carried forward the same narrowing amendment throughout the chain of applications eventually leading to the '209 patent.  ¶¶ 47, 58-59.  Because prosecution history estoppel applies when amendments have been made in a patent's parent application, Biovail Corp. Intern. v. Andrx Pharm., Inc., 239 F.3d 1297, 1301, 1304 (Fed. Cir. 2001), Lilly's amendments constrain the '209 patent's range of equivalents unless it can rebut the Festo presumption.

Lilly's narrowing amendment triggers a presumption that Lilly must rebut to sustain its theory that pemetrexed ditromethamine is equivalent to pemetrexed disodium, because pemetrexed ditromethamine is an antifolate (and thus within the presumptively surrendered territory between pemetrexed disodium at the narrow end, and antifolates generally at the broad end).[8]  ECF No. 130 at 7 (Lilly admits its "originally filed claims generically encompassed pemetrexed ditromethamine . . . .").  To rebut this presumption, Lilly must show that it could not have been expected to have drafted a claim that would have captured pemetrexed ditromethamine literally, either because it was unforeseeable or because the reason for the amendment had no more than a tangential relation to it.  Festo, 535 U.S. at 740-41 (also recognizing possibility of "some other reason" why patentee could not have been expected to claim alleged equivalent).

### 2.    Lilly cannot rebut the presumption of prosecution history estoppel

Lilly has the burden of rebutting the presumption that it surrendered the subject matter between "pemetrexed disodium" as narrowly claimed and "antifolates" generally, which included the alleged equivalent pemetrexed ditromethamine.  Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 344 F.3d 1359, 1368 (Fed. Cir. 2003).  Whether Lilly is able to rebut the

---

[8] Festo, 535 U.S. at 733-34 ("When, however, the patentee originally claimed the subject matter alleged to infringe but then narrowed the claim in response to a rejection, he may not argue that the surrendered territory comprised unforeseen subject matter that should be deemed equivalent to the literal claims of the issued patent.").

presumption is a question of law.  Id.

The modest uncertainty created by the doctrine of equivalents is justified by the limitations of language.  Festo, 535 U.S. at 731 ("Unfortunately, the nature of language makes it impossible to capture the essence of a thing in a patent application.").  But when, as here, it is clear that words were not inadequate for Lilly to claim more broadly than just "pemetrexed disodium," prosecution history estoppel confines Lilly to the choice it made:

> Prosecution history estoppel ensures that the doctrine of equivalents remains tied to its underlying purpose. Where the original application once embraced the purported equivalent but the patentee narrowed his claims to obtain the patent or to protect its validity, the patentee cannot assert that he lacked the words to describe the subject matter in question. The doctrine of equivalents is premised on language's inability to capture the essence of innovation, but a prior application describing the precise element at issue undercuts that premise. In that instance the prosecution history has established that the inventor turned his attention to the subject matter in question, knew the words for both the broader and narrower claim, and affirmatively chose the latter.  [Id. at 734-35.]

Lilly cannot show that other salts or forms of pemetrexed (besides the disodium salt) were unforeseeable.  ███████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

████████████████████████████  Both those patents disclose (i) pharmaceutically

acceptable salts generally, and (ii) the <u>specific group</u> of salts that includes tromethamine.  ¶¶ 62, 64; <u>see also</u> ¶¶ 61, 75-77.[9]

The foreseeability of other salts of pemetrexed is also shown by Lilly's prosecution of a different patent application for pemetrexed formulations that was (i) co-pending with the application for the '209 patent, and (ii) prosecuted by the same in-house patent attorney (Ms. McGraw).  ¶¶ 69, 71-72.  That application, which ultimately issued as U.S. Patent 6,686,365, defined the word "pemetrexed" to include "pharmaceutically acceptable" salts, and flagged as "especially preferred" a group of salts that includes tromethamine.  ¶¶ 62, 70.

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████

Lilly cannot show that other salts of pemetrexed were unforeseeable, such that its decision to claim only pemetrexed disodium should be excused.  <u>See also</u> ¶¶ 60-62, 64-65, 73, 81.  For example, the claims at issue in <u>Glaxo Wellcome, Inc. v. Impax Labs., Inc., 356 F.3d 1348 (Fed. Cir. 2004)</u>, were directed to sustained-release formulations of buproprion hydrochloride that contained the excipient HPMC.  Because the proposed generic used HPC instead of HPMC, Glaxo relied on the doctrine of equivalents.  The district court granted summary judgment of noninfringement based on prosecution history estoppel, finding that (i) Glaxo had narrowed its claims during prosecution to recite HPMC, and (ii) "anyone skilled in the art would have known that HPC and HPMC were substantially equivalent."  <u>Id. at 1351</u>.  The

---

[9] Tromethamine is one of a few FDA-approved cations for use in salt formation, and has been used to provide a number of FDA-approved commercially-available drug salts.  Tromethamine is listed directly next to sodium in literature reporting on FDA-approved cations.  ¶¶ 66-68.

Federal Circuit affirmed, rejecting Glaxo's argument that use of HPC as a sustained-release excipient for buprorion hydrochloride was not foreseeable because no reference identified HPC as a sustained-release excipient for that <u>particular</u> drug.  Glaxo's argument applied foreseeability too narrowly, given that the prior art described HPC as a sustained-release excipient for <u>other</u> drugs, and nothing provided a "verifiable scientific reason that Glaxo would not have considered HPC a suitable sustained release agent for bupropion." <u>Id. at 1355-56</u>.  <u>See also</u> <u>Duramed Pharms., Inc. v. Paddock Labs., Inc., 644 F.3d 1376, 1380-81 (Fed. Cir. 2011)</u> (rejecting similar argument and noting that "foreseeability does not require such precise evidence of suitability").

In <u>Ranbaxy Pharms., Inc. v. Apotex, Inc., 350 F.3d 1235 (Fed. Cir. 2003)</u>, the patent was directed to methods of making a certain form of an antibiotic in a "highly polar solvent."  During prosecution, the patentee amended its claims to specify that the highly polar solvent is a sulfoxide, an amide, or formic acid.  <u>Id. at 1237-39</u>.  It asserted the patent against a competitor that made the drug in acetic acid (a different highly polar solvent).  To prove that acetic acid was equivalent to formic acid, it argued that they were "readily known by chemists to exhibit similar properties." <u>Id. at 1241</u>.  The Federal Circuit affirmed the district court's denial of a preliminary injunction based on prosecution history estoppel, writing that "the notion that acetic acid was unforeseeable at the time of application flies in the face" of the patentee's argument that they were known equivalents for purposes of proving infringement.  <u>Id.</u>

Nor can Lilly show that the accused equivalent (pemetrexed ditromethamine) is "merely tangential" to the rationale for its narrowing amendment:  Lilly made it to overcome the PTO's rejection of claims using "antifolates" generally as unpatentable over the prior art.  ¶¶ 53, 55.  Lilly did not incidentally end up excluding alternative salts of pemetrexed; it elected to narrow its claim to eliminate all antifolates except one compound, pemetrexed disodium, despite

- 27 -

knowing that it was no longer claiming other forms of pemetrexed (like pemetrexed ditromethamine). ¶¶ 7, 56-57; see also ¶¶ 47-55, 81. Lilly admits that its "originally filed claims generically encompassed pemetrexed ditromethamine." ECF No. 130 at 7. Lilly cannot argue now that it did not have to make such a severe amendment and could have overcome the PTO's rejection with a less radical amendment that would have left intact claim scope that captured pemetrexed ditromethamine. If it wanted to seek broader claims, the time to do that was during prosecution, when its attempts could have been examined by the PTO for patentability. Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 33 n.7 (1997).

As made clear by the Supreme Court, the "tangential" option is not a free-floating exception to prosecution history estoppel, but is subsumed in the requirement that the patentee seeking to rebut the Festo presumption must show that it could not reasonably have been expected to have drafted claims literally embracing the alleged equivalent.[10] Accordingly, Lilly cannot show that its amendment was "tangential" by arguing that pemetrexed ditromethamine was not in the prior art. Chimie v. PPG Indus. Inc., 402 F.3d 1371, 1383 (Fed. Cir. 2005).

For example, original claims in a patent application directed to formulations of certain antihypertensives required a "metal containing stabilizer" or "alkali or alkaline earth-metal salt." The PTO rejected them over prior art disclosing a similar formulation with magnesium stearate, which is both a "metal containing stabilizer" and an "alkali or alkaline earth-metal salt." In response, the applicant narrowed this limitation to "alkali or alkaline earth-metal carbonate," an example of which is magnesium carbonate. Schwarz Pharma, Inc. v. Paddock Labs., Inc., 504 F.3d 1371, 1372-73 (Fed. Cir. 2007). Its claim that a generic product using magnesium oxide

---

[10] 535 U.S. at 741; Biagro W. Sales, Inc. v. Grow More, Inc., 423 F.3d 1296, 1305 (Fed. Cir. 2005); see also Festo, 344 F.3d at 1376 (Rader, J., concurring) (explaining overarching principle is "the doctrine of equivalents does not embrace subject matter that the patent drafter could have foreseen during the application process and thus could have included in the claims").

(MgO) infringed under the doctrine of equivalents was dismissed on summary judgment based on prosecution history estoppel. The Federal Circuit affirmed, rejecting the patentee's argument that the amendment was tangential to the accused equivalent (MgO) even though MgO was <u>not</u> disclosed in the prior-art reference that prompted the amendment (the Veber patent):

> Here, the use of MgO is directly implicated by the amendment of the claim language at issue because the language amended concerns the types of stabilizers covered by the claims and excludes MgO. The fact that the inventors may have thought after the fact that they could have relied on other distinctions in order to defend their claims is irrelevant and speculative; the inventors chose to distinguish over the Veber patent by narrowing the range of claimed stabilizers to exclude the one disclosed in Veber, as well as others. . . . .
>
> We cannot say in such a case that the amendment was no more than tangentially related to the equivalent at issue. In fact, quite the opposite appears to be true; the narrowing amendment was directly related to the range of equivalents that Schwarz now seeks to recapture.                     [Id. at 1377-78]

So too here: Lilly's narrowing amendment from "antifolate" to "pemetrexed disodium" limited the scope of drugs in the claimed method from a broad class (antifolates)—which included the accused equivalent—to a single compound (pemetrexed disodium). ¶¶ 53-54, 57. As in <u>Schwarz</u>, that amendment is "directly related to the range of equivalents" that Lilly now seeks to recapture; it goes directly to the identify and number of potential antifolates.

Similarly, the patentee in <u>Festo</u> amended its claims to require "a pair of resilient sealing rings" in response to a prior-art rejection over patents that did not disclose sealing rings, <u>344 F.3d at 1373</u> (the Blair patent), and argued that this was tangential to the accused equivalent that was a single sealing ring. The Federal Circuit affirmed summary judgment rejecting this argument because the "sealing ring" amendment was made to distinguish the prior art, and the accused equivalent was itself a sealing ring. So too here: because Lilly made the "pemetrexed

disodium" amendment to distinguish prior art that disclosed other antifolates, and the accused

equivalent (pemetrexed ditromethamine) is itself an antifolate (¶¶ 47-62, 81), the accused

equivalent is not "merely tangential" to the rationale for the amendment.

### B.     Lilly's equivalents claim is barred by the disclosure-dedication rule

A different but related limit on the doctrine of equivalents is the "disclosure-dedication"

rule, which provides that the doctrine of equivalents cannot reach alternatives to the claim

element that were disclosed in the patent specification but not claimed.  Its rationale is similar to

that of prosecution history estoppel, which is to prevent a patentee from capturing under the

doctrine of equivalents subject matter that it could have embraced literally.[11]

The disclosure-dedication rule typically applies to claims that were not amended during

prosecution, with prosecution history estoppel controlling when the claims were amended.  Even

though the claims here are subject to prosecution history estoppel by virtue of Lilly's narrowing

amendment, DRL presents its argument for application of the disclosure-dedication rule for two

reasons.  First, Lilly has at times stated that its amendment did not trigger prosecution history

estoppel.  Second, because the basic rationale for both doctrines is the same, an equivalent that

cannot be captured by an unamended claim under the disclosure-dedication rule cannot be

captured by an amended claim, which a fortiori cannot have a broader scope of equivalents.[12]

PSC Computer Products concerned a patent on securing heat sinks to computer chips

with a "resilient metal strap."  355 F.3d at 1355.  The district court granted summary judgment of

---

[11]  PSC Computer Prods., Inc. v. Foxconn Int'l, Inc., 355 F.3d 1353, 1359-60 (Fed. Cir. 2004)
(affirming summary judgment of noninfringement under the doctrine of equivalents based on
disclosure-dedication rule, explaining that it "requires an inventor who discloses specific subject
matter to claim it, and to submit the broader claim for examination.  Otherwise, that matter is
dedicated to the public and may not be recaptured under the doctrine of equivalents.").

[12]  Cf. Aventis Pharms., Inc. v. Barr Labs., Inc., 335 F. Supp. 2d 558, 574 (D.N.J. 2004)
(considering disclosure-dedication "as further support for a finding that the equivalents in
question have been surrendered" after having concluded that claims of infringement under the
doctrine of equivalents were barred by prosecution history estoppel).

noninfringement based on the disclosure-dedication rule, holding that the plastic clips in the accused equivalent were disclosed but not claimed. The patentee argued that this was error because the specification's disclosure of plastic was "neither precise nor clear." Id. at 1358. The Federal Circuit disagreed, holding that while the disclosure of "other resilient materials" was not specific enough, a disclosure that "[o]ther prior art devices use molded plastic and/or metal parts that must be cast or forged which again are more expensive metal forming operations" permitted readers to "reasonably conclude" that plastic could substitute for metal. Id. at 1360.

Here, Lilly's definition of antifolates in the '209 patent makes clear that the compounds defined as antifolates were alternatives to pemetrexed disodium and each other. ¶¶ 54, 56, 60-65. Lilly may argue that that disclosure is more akin to "other resilient materials" than to plastic clips, but that argument conflates a generic description with an extensive one. Here, the Akimoto patent identified in the specification of the '209 patent as providing antifolates suitable for use in the claimed invention discloses both pemetrexed and pharmaceutically acceptable salts thereof. ¶¶ 61-64. To be sure, it also discloses other antifolates, but the specification's statement that pemetrexed disodium is "most preferred" directs the reader to pemetrexed. Thus, because the '209 patent discloses other forms of pemetrexed as alternatives to its "most preferred" pemetrexed disodium, those other forms are dedicated to the public because Lilly elected (for whatever reason) not to claim them.[13]

### C. Even if not barred by prosecution history estoppel or the disclosure-

---

[13] PSC Computer Prods., 355 F.3d at 1361 (explaining that disclosure-dedication rule should "motivate patentees to draw the broadest claims that they consider to be patentable, and to submit these broad claims to the PTO for examination"); Aventis Pharms., 355 F. Supp. 2d at 577 n.13 (doctrine applicable to ingredients identified in specification "because they have been described by the patent drafter himself") (emphasis in original); see also Sage Prods., Inc. v. Devon Indus., Inc., 126 F.3d 1420, 1425 (Fed. Cir. 1997) ("as between the patentee who had a clear opportunity to negotiate broader claims but did not do so, and the public at large, it is the patentee who must bear the cost of its failure to seek protection for this foreseeable alteration").

**dedication rule, Lilly's doctrine of equivalents claim fails because it cannot prove that pemetrexed ditromethamine in the DRL product is a patent-law equivalent of pemetrexed disodium as claimed in the '209 patent**

Lilly's claim that healthcare providers directly infringe under the doctrine of equivalents separately fails on the merits even if Lilly is able to clear the bar of prosecution history estoppel and disclosure-dedication. This failure can in part be seen by the manner in which it would embrace any antifolate as purportedly equivalent to pemetrexed disodium, despite the PTO's rejection of Lilly's attempt to claim antifolates generally. ¶¶ 78-81.

As noted above, the PTO's rejection made Lilly narrow its claims from methods of administering antifolates generally. ¶¶ 47-55. Thus, a theory of equivalents generally applicable to <u>all</u> antifolates is legally precluded because it would vitiate Lilly's decision to give up claims to all antifolates in favor of limiting them to pemetrexed disodium. For example, the claims at issue in <u>Tronzo v. Biomet, Inc., 156 F.3d 1154 (Fed. Cir. 1998)</u>, were directed to artificial hip joints in which the socket (cup) portion of the joint had a conical shape. The accused infringing product had a hemispherical cup, which the jury found was equivalent to a conical cup based on testimony of the patentee's expert that the shape of the cup did not matter once it was implanted. <u>Id. at 1160</u>. The Federal Circuit reversed: because the expert's theory applied without regard to the specific shape of the cup, it was legally inadequate to prove infringement under the doctrine of equivalents. <u>Id.</u> (explaining that attempt to prove equivalence in this manner ran afoul of Supreme Court precedent by vitiating the claims' requirement of a specific shape).

Lilly's theory of equivalents suffers the same infirmity that led to reversal of the jury verdict in <u>Tronzo</u>. Its expert Dr. Chabner confirmed that his theory under which pemetrexed ditromethamine was equivalent to pemetrexed disodium would apply equally to <u>any</u> antifolate. ¶¶ 78-79. Just as Tronzo's expert failed to prove equivalence because his theory would apply regardless of the shape of the cup, such that any shape could be equivalent to the specific shape

Tronzo claimed, Dr. Chabner fails to prove equivalence by conceding that any antifolate would be equivalent to the specific one (pemetrexed disodium) claimed in the '209 patent.

## IV.   EVEN IF THERE WERE DIRECT INFRINGEMENT BY HEALTHCARE PROVIDERS, LILLY CANNOT PROVE THAT DRL IS LIABLE FOR THEIR ACTIONS UNDER A THEORY OF INDIRECT INFRINGEMENT

To prevail on its claims of indirect infringement, Lilly must also prove that DRL both knows of the direct infringement and specifically intends to cause it (and indeed does cause it); mere knowledge of possible infringement will not suffice. DSU Med. Corp. v. JMS Co., 471 F.3d 1293, 1305 (Fed. Cir. 2006) (requiring proof of "specific intent and action" to induce infringement). Liability for indirect infringement cannot attach just because the accused infringer knows what the actions of the potential direct infringer are, and that those actions might be infringing: it "requires proof that the defendant knew the acts were infringing." Commil USA, LLC v. Cisco Sys., Inc., 135 S. Ct. 1920, 1928 (2015) (emphasis added); Global–Tech Appliances, Inc. v. SEB S. A., 563 U.S. 754, 766 (2011).

### A.   Lilly cannot prove that DRL would induce infringement under 35 U.S.C. § 271(b)

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████.

Even if Lilly were correct on these points, its claim would fail because it cannot prove that DRL intends to cause infringement. ¶¶ 8-24, 28-29, 32, 35-42. Regardless of how Lilly thinks that healthcare providers will read the DRL label, Lilly cannot present evidence that DRL itself believes they will read it that way. If there are two possible readings of DRL's label—one

that results in direct infringement and one that does not—Lilly would have to prove that DRL specifically intended the former (infringing) to show that DRL <u>intended</u> to cause infringement. This it cannot do.[14] ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

### B.    Lilly cannot prove contributory infringement under 35 U.S.C. § 271(c)

A patentee asserting contributory infringement must show that the product alleged to contribute to direct infringement is not suitable for "substantial noninfringing use." <u>35 U.S.C. § 271(c)</u>.  Noninfringing uses are substantial "when they are not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." <u>Vita-Mix Corp. v. Basic Holding, Inc., 581 F.3d 1317, 1328 (Fed. Cir. 2009)</u>.  Lilly cannot make this showing.

Lilly's contention that healthcare providers will directly infringe when using DRL's product in combination with cisplatin fails because it does not account for the ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████ ████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ Unless Lilly is able to show that the usage of

---

[14] <u>Takeda Pharm. U.S.A., Inc. v. West-Ward Pharm. Corp., 785 F.3d 625, 632 (Fed. Cir. 2015)</u> ("vague label language cannot be combined with speculation about how physicians may act to find inducement"); <u>United Therapeutics Corp. v. Sandoz, Inc., No. 12-CV-01617, 2014 WL 4259153, at *17–19 (D.N.J. Aug. 29, 2014)</u> (possibility that label will prompt a "scholarly scavenger hunt—which <u>may</u> be incited by a reference in [a] proposed label, which <u>may</u> be undertaken by some physicians" is not evidence of intent) (emphasis in original).

the DRL product would be far different, it cannot show that the DRL products lacks a substantial noninfringing use.[15]

## CONCLUSION

For the reasons set forth above, the Court should grant DRL's motion for summary judgment of noninfringement and enter judgment in DRL's favor.

Respectfully submitted,

*/s/ Stephen E. Arthur*
Stephen E. Arthur, Atty. No. 4055-49
Rory O'Bryan, Atty. No. 9707-49
HARRISON & MOBERLY, LLP
10 West Market Street, Suite 700
Indianapolis, Indiana 46204
Telephone:     (317) 639-4511
Facsimile:     (317) 639-9565
Email: sarthur@harrisonmoberly.com
Email: robryan@harrisonmoberly.com

Jeffery B. Arnold                          Charles A. Weiss
HOLLAND & KNIGHT LLP                        Merri C. Moken
1180 Peachtree Street                      HOLLAND & KNIGHT LLP
Suite 1800                                 31 West 52nd Street
Atlanta, GA 30309                          New York NY 10019
Tel: (404) 817-8432                        Tel: (212) 513-3383
Fax: (404) 881-0470                        Fax: (212) 385-9010
Email: jarnold@hklaw.com                   Email: charles.weiss@hklaw.com
                                           Email: merri.moken@hklaw.com

*Counsel for Defendants Dr. Reddy's Laboratories, Ltd. And Dr. Reddy's Laboratories, Inc.*

---

[15] Because Lilly's theory of contributory infringement, wherein the direct infringement occurs under the doctrine of equivalents is not limited to the case in which the DRL product is used for combination therapy with cisplatin, the presence of a substantial noninfringing use would not defeat Lilly's claim. However, Lilly would still be required to prove that DRL intended to contribute to infringement, and for the reasons set forth above with respect to Lilly's inability to show intent to inducement, it cannot carry its burden with respect to contributory infringement (regardless of whether the alleged direct infringement occurs literally or under the doctrine of equivalents).

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of July 2017, a copy of the foregoing Defendants Dr. Reddy's Laboratories, Ltd.'s and Dr. Reddy's Laboratories, Inc.'s *Brief in Support of Motion for Summary Judgment of Noninfringement* was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system:

**Jan M. Carroll**
**Anne N. DePrez**
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, IN 46204
(317) 236-1313
Fax: (317) 231-7433
Email: jan.carroll@btlaw.com
Email: anne.deprez@btlaw.com

**Bruce Roger Genderson**
**Christopher T. Berg**
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
202-434-5999
Fax: (202) 434-5029
Email: bgenderson@wc.com
Email: cberg@wc.com

**Adam L. Perlman**
**Alec T. Swafford**
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
202-434-5149
Fax: (202) 434-5029
Email: aperlman@wc.com
Email: aswafford@wc.com

**David M. Krinsky**
**Dov P. Grossman**
**Galina Fomenkova**
WILLIAMS & CONNOLLY, LLP
725 Twelfth Street, NW
Washington, DC 20005
202-434-5338
Fax: (202) 434-5029
Email: dkrinsky@wc.com
Email: dgrossman@wc.com
Email: gfomenkova@wc.com

*/s/ Stephen E. Arthur*
Stephen E. Arthur, Atty. No. 4055-49
Rory O'Bryan, Atty. No. 9707-49
HARRISON & MOBERLY, LLP
10 West Market Street, Suite 700
Indianapolis, Indiana 46204
Telephone:     (317) 639-4511
Facsimile:     (317) 639-9565
Email: sarthur@harrisonmoberly.com
Email: robryan@harrisonmoberly.com

*Counsel for Defendants*
*Dr. Reddy's Laboratories, Ltd. and*
*Dr. Reddy's Laboratories, Inc.*